**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARK WYNAR, an individual and as guardian of Landon Wynar; LANDON WYNAR, a Minor,<br>*Plaintiffs-Appellants*,<br><br>v.<br><br>DOUGLAS COUNTY SCHOOL DISTRICT, a political subdivision of the State of Nevada; CAROL LARK; NANCY BRYANT; MARTY SWISHER; DAVID PYLE; CYNTHIA TRIGG; KEITH ROMAN; SHARLA HALES,<br>*Defendants-Appellees*. | No. 11-17127<br><br>D.C. No.<br>3:09-cv-00626-LRH-VPC<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
May 16, 2013—San Francisco, California

Filed August 29, 2013

Before: M. Margaret McKeown and Paul J. Watford, Circuit Judges, and Thomas S. Zilly, Senior District Judge.[*]

Opinion by Judge McKeown

---

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment in an action brought under 42 U.S.C. § 1983 by a high school student and his father after the student was temporarily expelled for sending violent and threatening instant messages from his home to his friends about planning a school shooting.

The panel held that the messages, which threatened the safety of the school and its students, both interfered with the rights of other students and made it reasonable for school officials to forecast a substantial disruption of school activities. The panel held that when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Under the circumstances, the

---

[*] The Honorable Thomas S. Zilly, Senior District Judge for the U.S. District Court for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel concluded that the school district did not violate the student's rights to freedom of expression or due process.

## COUNSEL

Jeffrey S. Blanck (argued), Reno, Nevada, for Plaintiffs-Appellants.

Ann M. Alexander (argued), Erickson, Thorpe & Swainston, Ltd., Reno, Nevada, for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights. It is a feat like tightrope balancing, where an error in judgment can lead to a tragic result. Courts have long dealt with the tension between students' First Amendment rights and "the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). But the challenge for administrators is made all the more difficult because, outside of the official school environment, students are instant messaging, texting, emailing, Twittering, Tumblring, and otherwise communicating electronically, sometimes about subjects that threaten the safety of the school environment. At the same time, school officials must

take care not to overreact and to take into account the creative juices and often startling writings of the students.

In this case, Landon Wynar,[1] a student at Douglas High School, engaged in a string of increasingly violent and threatening instant messages sent from home to his friends bragging about his weapons, threatening to shoot specific classmates, intimating that he would "take out" other people at a school shooting on a specific date, and invoking the image of the Virginia Tech massacre. His friends were alarmed and notified school authorities, who temporarily expelled Landon based in large part on these instant messages. We affirm the district court's grant of summary judgment to the school district. The messages presented a real risk of significant disruption to school activities and interfered with the rights of other students. Under the circumstances, the school district did not violate Landon's rights to freedom of expression or due process.

## BACKGROUND

When the events at issue occurred, Landon was a sophomore at Douglas High School. He collected weapons and ammunition and reported owning various rifles, including a Russian semi-automatic rifle and a .22 caliber rifle.

Landon communicated regularly with friends from school by exchanging instant messages through the website MySpace. MySpace is a social networking website that

---

[1] The parties' briefs refer to Landon as "LW," but the appeal was filed in Landon's full name, and Landon's attorney confirmed at oral argument that his name was not under seal and had been made public. Landon is no longer a minor.

allows its members to set up online "profiles" and communicate via email, instant messages, and blogs. *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 208 & n.2 (3d Cir. 2011) (en banc). Instant messages enable "users to engage in real-time dialogue 'by typing messages to one another that appear almost immediately on the others' computer screens.'" *United States v. Meek*, 366 F.3d 705, 709 n.1 (9th Cir. 2004) (quoting *Reno v. ACLU*, 521 U.S. 844, 851–52 (1997)).

Among other things, Landon wrote frequently about weapons, going shooting, and World War II (often mentioning Hitler, whom he once referred to as "our hero"). His messages also expressed social insecurity, stating, for example, "[my parents] also dont like me just like everyone at school," and "its ignore landon day everyday."[2] Some months into his sophomore year, Landon's MySpace messages became increasingly violent and disturbing. They included the following statements, all centered around a school shooting to take place on April 20 (the date of Hitler's birth and the Columbine massacre and within days of the anniversary of the Virginia Tech massacre):

- "its pretty simple / i have a sweet gun / my neighbor is giving me 500 rounds / dhs is gay / ive watched these kinds of movies so i know how NOT to go wrong / i just cant decide who will be on my hit list / and thats totally deminted and it scares even my self"

---

[2] All typographical errors in the messages quoted throughout are in the original messages.

- "i havent decided which 4/20 i will be doing it on / by next year, i might have a better gun to use such as an MI cabine w/ a 30 rd clip. . . .or 5 clips. . . .10?"

- "and ill probly only kill the people i hate?who hate me / then a few random to get the record"

- [in response to a statement that he would "kill everyone"] "no, just the blacks / and mexicans / halfbreeds / athiests / french / gays / liberals / david"

- [referring to a classmate] "no im shooting her boobs off / then paul (hell take a 50rd clip) / then i reload and take out everybody else on the list / hmm paul should be last that way i can get more people before they run away..."

- "she only reads my mesages and sometimes doesnt even do that. / shes #1 on 4/20"

- "ya i thought about ripping someones throat out with one. / wow these r weird thoughts... / then raping some chicks dead bodies to? no. maybe. idk."

- "that stupid kid from vtech. he didnt do shit and got a record. i bet i could get 50+ people / and not one bullet would be wasted."

- "i wish then i could kill more people / but i have to make due with what i got. / 1 sks & 150 rds / 1 semi-auto shot gun w/sawed off barrle / 1 pistle"

Although Landon's friends apparently joked with him at times about school violence, the tenor of these escalating comments alarmed them, and they corresponded with each

other to decide what to do. One boy forwarded Landon's messages to a friend, who responded, "thats [f . . .] crazy / landon and i have and messages like that too / he told me he was going to rape [redacted] / then kill her / then go on a school shotting / maybe we should be worried." After seeing the messages, a third boy wrote, "Jesus Christ dude!!! / this is some really serious shit!!! / wat do we do? / i mean that is really really sico shit and this is not something to be taking lightly seriously." The first two boys decided to speak with one of their coaches and "ask them how to deal with him / like how not to make him tick and go on a rampage."

The boys went to a football coach whom they trusted and then, together with the coach, they talked to the school principal about their concerns. They told the principal that they had information about a possible school shooting. After two police deputies interviewed the boys and saw the MySpace printouts, they questioned Landon in the principal's office.

After the police took Landon into custody, school administrators met with him and asked if he wanted his parents to be present for their discussion. Landon said that he did not. They asked Landon about the MySpace messages, which he admitted writing but claimed were a joke. After providing a signed, written statement, Landon was suspended for 10 days.

The school board charged Landon with violating Nev. Rev. Stat. § 392.4655, among other things, and convened a formal hearing. Section 392.4655(1)(a) provides that a student will be deemed a habitual discipline problem if there is written evidence that the student threatened or extorted another pupil, teacher, or school employee. Under Nev. Rev.

Stat. § 392.466(3), a student who is deemed a habitual disciplinary problem must be suspended or expelled for at least a semester. At the school board hearing, Landon was represented by an attorney. He had the opportunity to call witnesses and present evidence, which he chose not to do, and to cross-examine the school's witnesses. Landon testified at the hearing. The board held that he violated § 392.4655 and expelled him for 90 days.

Landon and his father, acting as guardian, sued the school district, school administrators, and school district officials and trustees (collectively, "Douglas County")[3] for violations of Landon's constitutional rights under 42 U.S.C. § 1983, as well as for negligence and negligent infliction of emotional distress.[4] The district court denied Landon's motion for summary judgment and granted Douglas County's motion for summary judgment. The material facts are not in dispute.

## ANALYSIS

## I.  FIRST AMENDMENT CLAIM

The Supreme Court has not yet addressed the applicability of its school speech cases to speech originating off campus, such as Landon's MySpace messages, which were written from home. Although the Court's prior cases are instructive,

---

[3] In the amended answer to the complaint, Douglas County raised a number of immunities as affirmative defenses. However, the district court did not address these, and Douglas County does not raise them here.

[4] Landon does not appeal from the district court's grant of summary judgment on his negligence and negligent infliction of emotional distress claims.

we also look to our circuit precedent and to our sister circuits for guidance. We hold that Douglas County did not violate Landon's First Amendment rights. Landon's messages, which threatened the safety of the school and its students, both interfered with the rights of other students and made it reasonable for school officials to forecast a substantial disruption of school activities.

## A.  FRAMEWORK FOR ANALYSIS

The Supreme Court's school speech jurisprudence echoes a common theme: although public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The Court has decided four lead student speech cases: *Tinker*; *Fraser*; *Hazelwood Sch. Dist.*, 484 U.S. 260; and *Morse v. Frederick*, 551 U.S. 393 (2007). Each governs a different area of student speech: "(1) vulgar, lewd, obscene, and plainly offensive speech" is governed by *Fraser*; "(2) school-sponsored speech" is governed by *Hazelwood*, and "(3) speech that falls into neither of these categories" is governed by *Tinker*. *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992). In *Morse*, the Court dealt with a fourth, and somewhat unique, category—speech promoting illegal drug use. 551 U.S. at 403. All four cases involved speech that took place at school or at a school-sanctioned event. Beyond those contexts, the Court has noted only that "[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents." *Morse*, 551 U.S. at 401.

In *LaVine v. Blaine School District*, our circuit's most analogous precedent, we held that a school did not violate the First Amendment rights of a student who was expelled on a temporary, emergency basis because of a first-person poem he wrote at home about a school shooting and suicide and later showed to his English teacher during class. 257 F.3d 981, 988 (9th Cir. 2001). Because the poem was neither lewd nor school-sponsored, we applied the *Tinker* test to the school's actions. *Id.* at 989. Under *Tinker*, schools may prohibit speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" or that collides "with the rights of other students to be secure and to be let alone." *Tinker*, 393 U.S. at 508, 514. Looking to the totality of the circumstances, *LaVine* concluded that the school could have reasonably "forecast substantial disruption of or material interference with school activities—specifically, that [the student] was intending to inflict injury upon himself or others." *LaVine*, 257 F.3d at 990. Against "the backdrop of actual school shootings," we considered that the student was involved in a domestic dispute, had recently broken up with his girlfriend and was reportedly stalking her, and had had disciplinary problems in the past. *Id.* at 989–90. "[M]aybe most important[] . . . was the poem itself." *Id.* at 990. "At its extreme it can be interpreted as a portent of future violence," and "[e]ven in its most mild interpretation, the poem appears to be a 'cry for help.'" *Id.*

Although we did not explicitly address the poem's off-campus origination, courts have nevertheless cited *LaVine* as an example of a case applying the *Tinker* test to off-campus student speech. *See, e.g.*, *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 n.22 (5th Cir. 2004) (listing *LaVine* as one of the cases in which courts have "[r]efus[ed] to

differentiate between student speech taking place on-campus and speech taking place off-campus"); *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1108 (C.D. Cal. 2010) (stating that "under the majority rule, and the rule established by the Ninth Circuit in *LaVine*, the geographic origin of the speech is not material").

We do not view *LaVine* as taking the position staked out for it by these other courts. *LaVine* definitely did not say that the geographic origin of speech doesn't matter, nor did it say that an individual's free speech rights are diminished simply by virtue of being a student. Rather, it dealt with speech created off campus but brought to the school by the speaker. This is not a minor distinction. Our case presents another variation—off-campus communication among students involving a safety threat to the school environment and brought to the school's attention by a fellow student, not the speaker. As explained below, the location of the speech can make a difference, but that does not mean that all off-campus speech is beyond the reach of school officials.

A number of our sister circuits have wrestled with the question of *Tinker*'s reach beyond the schoolyard. The Second, Fourth, and Eighth Circuits have concluded that *Tinker* applies to certain off-campus speech. *See, e.g.*, *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008) (student disqualified from running for class secretary after posting a vulgar and misleading message about the supposed cancellation of an upcoming school event on a web log ("blog") from home); *Kowalski v. Berkeley County Schs.*, 652 F.3d 565 (4th Cir. 2011) (student suspended for creating and posting to a MySpace webpage that was largely dedicated to ridiculing a fellow student); *S.J.W. v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012) (students suspended

for creating website with offensive and racist comments discussing fights at their school and mocking black students, as well as sexually explicit and degrading comments about particular female classmates). These circuits have imposed some additional threshold test before applying *Tinker* to speech that originates off campus. For example, the Fourth Circuit requires that the speech have a sufficient "nexus" to the school, *Kowalski*, 652 F.3d at 573, while the Eighth Circuit requires that it be "reasonably foreseeable that the speech will reach the school community." *S.J.W.*, 696 F.3d at 777. The Second Circuit has not decided "whether it must be shown that it was reasonably foreseeable that [the speech] would reach the school property or whether the undisputed fact that it did reach the school pretermits any inquiry as to this aspect of reasonable foreseeability." *Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 39 (2d Cir. 2007). But at least where it is reasonably foreseeable that off-campus speech meeting the *Tinker* test will wind up at school, the Second Circuit has permitted schools to impose discipline based on the speech. *Doninger*, 527 F.3d at 48.

The Third and Fifth Circuits have left open the question whether *Tinker* applies to off-campus speech. In *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926, 930 (3d Cir. 2011) (en banc), the Third Circuit "assume[d], without deciding, that *Tinker* applie[d]" to a student's creation of a parody MySpace profile mocking the school principal, but held that it was not reasonably foreseeable that the speech would create a substantial disruption.[5] In a

---

[5] In another Third Circuit en banc case decided the same day as *Blue Mountain*, and also involving a principal parody profile, the school district did "not dispute the district court's finding that its punishment of [the student] was not appropriate under *Tinker*." *Layshock v. Hermitage Sch.*

separate concurrence, five judges expressed their position that *Tinker* does not apply to off-campus speech and that "the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large." *Id.* at 936 (Smith, C.J., concurring). The Fifth Circuit similarly left the question open in *Porter*, 393 F.3d at 615–16 n.22 (noting the "difficulties posed by state regulation of student speech that takes place off-campus and is later brought on-campus"). In that case, the student's speech was not even "directed at the campus." *Id.* at 615.

One of the difficulties with the student speech cases is an effort to divine and impose a global standard for a myriad of circumstances involving off-campus speech. A student's profanity-laced parody of a principal is hardly the same as a threat of a school shooting, and we are reluctant to try and craft a one-size fits all approach. We do not need to consider at this time whether *Tinker* applies to all off-campus speech such as principal parody profiles or websites dedicated to disparaging or bullying fellow students. These cases present challenges of their own that we will no doubt confront down the road. Nor do we need to decide whether to incorporate or adopt the threshold tests from our sister circuits, as any of these tests could be easily satisfied in this circumstance. Given the subject and addressees of Landon's messages, it is hard to imagine how their nexus to the school could have been more direct; for the same reasons, it should have been reasonably foreseeable to Landon that his messages would reach campus. Indeed, the alarming nature of the messages

---

*Dist.*, 650 F.3d 205, 216 (3d Cir. 2011) (en banc). The school district relied instead on *Fraser*. *Id.* But the court went on to note that *Fraser* didn't allow the school "to punish [the student] for expressive conduct which occurred outside of the school context." *Id.* at 219.

prompted Landon's friends to do exactly what we would hope any responsible student would do: report to school authorities. Here we make explicit what was implicit in *LaVine*: when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker*.

As we wrote in *LaVine*: "Given the knowledge the shootings at Columbine, Thurston and Santee high schools, among others,[6] have imparted about the potential for school violence . . . we must take care when evaluating a student's First Amendment right of free expression against school officials' need to provide a safe school environment not to overreact in favor of either." 257 F.3d at 983. The approach we set out strikes the appropriate balance between allowing schools to act to protect their students from credible threats of violence while recognizing and protecting freedom of expression by students.

## B. APPLICATION TO LANDON'S MY SPACE MESSAGES

Confronted with messages that could be interpreted as a plan to attack the school, written by a student with confirmed access to weapons and brought to the school's attention by fellow students, Douglas County faced a dilemma every school dreads. As the Eleventh Circuit noted in a similar

---

[6] In the twelve years since *LaVine* was decided, many more names have joined this tragic list. When we decided *LaVine*, the shooting at Columbine High School, in which thirteen people died, was the deadliest school shooting to date. Since then there have been two even deadlier school shootings: at Virginia Tech and at Sandy Hook Elementary School. U.S. Dep't of Health & Human Servs., *Mass Murders: Why Us? Why the U.S.?*, Healthfinder.gov, http://healthfinder.gov/News/Article.aspx?id=671871 (last visited Aug. 21, 2013).

case, "[w]e can only imagine what would have happened if the school officials, after learning of [the] writing, did nothing about it" and Landon did in fact come to school with a gun. *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007). "School officials have a difficult task in balancing safety concerns against chilling free expression." *LaVine*, 257 F.3d at 992. Under the circumstances of this case, Douglas County did not violate Landon's First Amendment rights by expelling him for 90 days.[7]

Under *Tinker*, schools may restrict speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" or that collides "with the rights of other students to be secure and to be let alone." 393 U.S. at 508, 514. Such speech is "not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. It is an understatement that the specter of a school shooting qualifies under either prong of *Tinker*.

## 1. Substantial Disruption or Material Interference with School Activities

The nature of the threats here was alarming and explosive. Confronted with a challenge to the safety of its students,

---

[7] If the MySpace messages constituted a "true threat," then they were not entitled to any First Amendment protection. *United States v. Cassel*, 408 F.3d 622, 627 (9th Cir. 2005). In the criminal arena, for speech to be deemed a "true threat," the speaker must have "subjectively intended the speech as a threat." *Id.* at 633. Landon has contended from the beginning that the messages were written in jest. As in *LaVine*, "[b]ecause we conclude that even if [the messages were] protected speech, the school actions were justified, we need not resolve" the question whether the messages were a true threat in the civil context presented here. 257 F.3d at 989 n.5.

Douglas County did not need to wait for an actual disruption to materialize before taking action. "*Tinker* does not require school officials to wait until disruption actually occurs before they may act. . . . 'In fact, they have a duty to prevent the occurrence of disturbances.'" *LaVine*, 257 F.3d at 989 (quoting *Karp v. Becken*, 477 F.2d 171, 175 (9th Cir. 1973)). We look to "all of the circumstances confronting the school officials that might reasonably portend disruption." *LaVine*, 257 F.3d at 989.

It was reasonable for Douglas County to interpret the messages as a real risk and to forecast a substantial disruption. Landon argues that the circumstances in *LaVine* that made it reasonable to forecast substantial disruption—"specifically, that [the student] was intending to inflict injury upon himself or others," 257 F.3d at 990—were absent.[8] For example, the student in *LaVine*, unlike Landon, had previous disciplinary problems, had discussed suicide with his counselor, was reportedly stalking his recent ex-girlfriend, and had been involved with a domestic dispute with his father. *See id.* at 991. That may be so, but other circumstances here made it exceedingly reasonable for the school officials to take Landon's messages seriously.

To begin, the harm described would have been catastrophic had it occurred. The messages suggest a

---

[8] Landon's emphasis on his lack of previous disciplinary problems is misplaced. A report by the Secret Service and the Department of Education that examined 37 incidents of targeted school shootings and school attacks found that nearly two-thirds of the attackers had never been in trouble or were rarely in trouble at school. U.S. Secret Serv. & U.S. Dep't of Educ., *The Final Report and Findings of the Safe School Initiative* ii, 20 (May 2002), *available at* http://www.secretservice.gov/ntac/ssi_final_report.pdf.

fascination with previous school shootings. Landon explicitly invoked the deadliest school shooting ever by a single gunman and stated that he could kill even more people without wasting a single bullet. The given date for the event—April 20—implicitly invoked another horrific mass school shooting—the massacre at Columbine.

In one of the most disturbing messages, Landon explicitly named his school: "its pretty simple / i have a sweet gun / my neighbor is giving me 500 rounds / dhs [**Douglas High School**] is gay / ive watched these kinds of movies so i know how NOT to go wrong / i just cant decide who will be on my hit list / and thats totally deminted and it scares even my self". Landon specified a date for the attack and described how he would kill two specific, named classmates, one of whom was to be "#1 on 4/20," while the other would be last so Landon could "get more people before they run away." Further, unlike the student in *LaVine*, 257 F.3d at 985, Landon stated that he had access to weapons and ammunition, so his friends and the school had reason to believe he had the ability to carry out a shooting. When questioned, Landon confirmed to a police officer that, as reported by his friends, he had weapons and ammunition at his house.

In contrast to the fake MySpace profile purporting to be the principal in *J.S*, which "was so outrageous that no one took its content seriously," 650 F.3d at 921, Landon's MySpace messages should have been taken seriously and apparently were. Landon's friends' MySpace messages to each other underscore their fear. The deputy sheriff who serves as a school resource officer for Douglas High School noted in his report that the friends who reported Landon's messages "were vis[i]bly shaken and believe the suspect is mentally disturbed." One female student who was mentioned

in Landon's MySpace messages reported that she was afraid of Landon and that her father would not let her return to school if Landon was there.

We need not discredit Landon's insistence that he was joking; our point is that it was reasonable for Douglas County to proceed as though he was not. Faced with this scenario, the school district officials reasonably could have predicted that they would have to spend "considerable time dealing with [parents' and students'] concerns and ensuring that appropriate safety measures were in place." *D.J.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 766 (8th Cir. 2011).

## 2. Invasion of the Rights of Others

Few circuit cases address the "invasion of the rights of others" prong of *Tinker*.[9] 393 U.S. at 513. As then-Circuit Judge Alito wrote, "[t]he precise scope of *Tinker*'s 'interference with the rights of others' language is unclear." *Saxe*, 240 F.3d at 217. We agree with the Third Circuit that "it is certainly not enough that the speech is merely offensive to some listener," *id.*, but decline to elaborate on when

---

[9] See *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000), and *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001), for examples of cases discussing *Tinker*'s "invasion of the rights of others" prong. We relied on this prong in *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166 (9th Cir. 2006). However, the judgment in that case was vacated and the appeal dismissed as moot after the student graduated. *Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007); *Harper v. Poway Unified Sch. Dist.*, 485 F.3d 1052, 1053 (9th Cir. 2007); *Harper v. Poway Unified Sch. Dist.*, 545 F. Supp. 2d 1072, 1077 (S.D. Cal. 2007), *aff'd in part, vacated in part*, 318 F. App'x 540 (9th Cir. 2009).

offensive speech crosses the line.  Whatever the scope of the "rights of other students to be secure and to be let alone," *Tinker*, 393 U.S. at 508, without doubt the threat of a school shooting impinges on those rights.  Landon's messages threatened the student body as a whole and targeted specific students by name.  They represent the quintessential harm to the rights of other students to be secure.

In holding that Douglas County's actions did not violate the First Amendment, we do not mean to imply approval of Douglas County's particular response to the perceived threat. We note that there was a more punitive character to the expulsion here than in *LaVine*, in which the school "allowed [the student] to return to class as soon as a mental health professional determined he was not a threat to himself or his classmates."  257 F.3d at 991 n.9.  In addition, we have observed before that "[s]imply expelling a student without providing some kind of counseling or supervision might not be the best response to a school's concern for potential violence." *Id.* at 990 n.7.  Our responsibility, however, is not to parse the wisdom of Douglas County's actions, but to determine whether they were constitutional.  We conclude that they were.

## II. PROCEDURAL DUE PROCESS CLAIM

Under Nevada law, Landon had a property interest in his public education and was therefore entitled to due process before he could be suspended. *See Goss v. Lopez*, 419 U.S. 565, 572–74 (1975); Nev. Const. art. 11, § 2.  Landon received adequate due process before both his 10-day suspension and his 90-day expulsion.

### A. 10-DAY SUSPENSION

The Supreme Court explained in *Goss* that "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. Landon does not argue that Douglas County did not comply with these requirements. Instead, he complains that the county did not comply with its own regulatory procedures for suspension and that it did not notify Landon's parents before meeting with him at the juvenile detention center.

Before suspending Landon for 10 days, the school administrators who met with him at the detention center told him that they had evidence that he had made threats on MySpace and that they wanted to get his side of the story, but Landon asserts that they did not follow exactly the school district's administrative regulations requiring that he be told of the "*specific* rules, policies, or procedures that are alleged to have been violated" (emphasis added) and that, if the evidence supported the allegations, the consequences could include suspension. As the district court noted, "defendants' purported failure to comply with their own administrative procedure does not, itself, constitute a violation of constitutional due process." *See Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1471 (9th Cir. 1984) (holding that a due process claim arising out of an alleged violation of a school's own regulations "would not make a search unconstitutional if it were otherwise valid under the Fourth Amendment"); *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 441 (9th Cir. 2008) ("Moreover, Plaintiffs provide no authority for their suggestion that a federal due process claim lies whenever a

*local* entity deviates from its *own* procedures in enacting a *local* regulation.") (emphasis in original). The notice Landon received was constitutionally adequate.

Neither the Constitution nor the school district's policies require parental notification prior to imposing a 10-day suspension or prior to meeting with a student.

## B.  90-DAY EXPULSION

Although the Constitution does not require that a school give a student "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, [and] to call his own witnesses to verify his version of the incident" before a short suspension, suspensions longer than 10 days or "expulsions for the remainder of the school term, or permanently, may require more formal process." *Goss*, 419 U.S. at 583–84. Neither the Supreme Court nor our own circuit has mandated specific procedures for a suspension of 90 days. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) (alteration omitted). In determining whether Landon received adequate due process, we consider Landon's interest in his education at Douglas High School; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and Douglas County's interest, including the not-insignificant burdens that the additional safeguards would entail. *See Mathews*, 424 U.S. at 335. We note that "administrative proceedings need not cleave to strict state evidentiary rules." *In re Estate of Covington*, 450 F.3d 917, 923 (9th Cir. 2006).

Before his expulsion, Landon received written notice of the charges and a list of possible witnesses. He was given "the right to be represented by an advocate of [his] choosing, including counsel," to present evidence and to call and cross-examine witnesses. Landon argues his due process rights were violated because he was not provided with evidence in advance of the hearing and because no witness testified to any disruption and hence he could not cross-examine on that point.

The additional procedures conceived by Landon were not constitutionally required. To begin, Landon *had* the key evidence—he acknowledged writing the messages and he had access to them through his MySpace account. As to witnesses on disruption, this is a question of the weight of the evidence, not a due process violation. In any event, *Tinker* does not require actual disruption before a school can impose discipline.

## III.   DUE PROCESS NOTICE CLAIM

Landon's notice argument—that his expulsion violated due process because he could not have known that he could be expelled for writing the MySpace messages—is without legal support. "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686. Apart from common sense, the school's student handbook, which is distributed at the beginning of each year, gave adequate warning to Landon that he could face sanctions for his alarming statements about shooting classmates. *See id.* The handbook reproduced verbatim the portion of § 392.4655

that the school board found Landon to have violated. In addition, the handbook stated in a separate section that behavior that was "intimidating, harassing, threatening, or disruptive" was subject to disciplinary action.

Landon was also on notice that he could face discipline even for certain off-campus actions. Unlike the portion of § 392.4655 dealing with fights, the portion dealing with threats does not contain a geographic limitation. *Compare* § 392.4655(1)(a) (deeming a student a habitual disciplinary problem if he or she has "threatened or extorted" a classmate, teacher, or school employee, with no specification of the location of the threat or extortion) *with* § 392.4655(1)(b) (deeming a student a habitual disciplinary problem if he or she "has been suspended for initiating at least two fights on school property, at an activity sponsored by a public school, on a school bus or, if the fight occurs within 1 hour of the beginning or end of a school day, on the pupil's way to or from school").

## IV.   APPLICABILITY OF § 392.4655

The district court correctly held that Douglas County did not misinterpret § 392.4655 in applying it to Landon. That section provides that "a principal of a school shall deem a pupil enrolled in the school a habitual disciplinary problem if the school has written evidence which documents that in 1 school year . . . [t]he pupil has threatened or extorted, or attempted to threaten or extort, another pupil or a teacher or other personnel employed by the school." § 392.4655(1)–(1)(a). According to Landon, he could not be "deemed a habitual disciplinary problem" under § 392.4655

because he only committed a single act.[10]  Although the statute requires multiple occurrences for certain types of conduct before a student is deemed a habitual disciplinary problem, it does not require more than one occurrence of threat or extortion.  As the district court pointed out, this "shows the legislature's intent to hold a single act of threatening conduct an expellable offense."  The plain language of the statute, which includes the legislative definition of "habitual disciplinary problem" in this context, is controlling.

Landon's argument that he could not be expelled because he did not intend to harm or intimidate anyone is equally unpersuasive.  Douglas County's correspondence with Landon's parents and the board minutes stated that Landon was being charged with a violation of board policy and Nev. Rev. Stat. § 392.4655, an administrative statute without an intent requirement.  Douglas County's reference to a different, criminal statute—Nev. Rev. Stat. § 392.915, with which Landon was not charged—in those same documents did not incorporate the intent element of that statute.  In any event, the school was not acting in the role of a government prosecutor enforcing a criminal statute.  Douglas County was not required to prove Landon's subjective intent in writing the messages before expelling him.

**AFFIRMED.**

---

[10] On appeal, Landon also argues that § 392.4655 is facially unconstitutional because it is overbroad and vague.  Because he did not raise this argument before the district court, we decline to consider it here. *See Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004).