**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KARA KOWALSKI,

        *Plaintiff-Appellant,*

        v.

BERKELEY COUNTY SCHOOLS, a
public school district; MANNY P.
ARVON, II, Superintendent, in his
official capacity; RONALD
STEPHENS, Principal, in his official
capacity and individually; BECKY
J. HARDEN, Vice Principal, in her
official capacity and individually;
BUFFY ASHCRAFT, cheerleading
coach, in her official capacity and
individually; RICK DEUELL,
Assistant Superintendent, in his
official capacity,

        *Defendants-Appellees.*

No. 10-1098

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
John Preston Bailey, Chief District Judge.
(3:07-cv-00147-JPB)

Argued: March 25, 2011

Decided: July 27, 2011

Before NIEMEYER, DUNCAN, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Duncan and Judge Agee joined.

---

**COUNSEL**

**ARGUED:** Nancy A. Dalby, Charles Town, West Virginia, for Appellant. Tracey Brown Eberling, STEPTOE & JOHNSON, LLP, Martinsburg, West Virginia, for Appellees. **ON BRIEF**: Jason P. Foster, STEPTOE & JOHNSON, LLP, Martinsburg, West Virginia, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

When Kara Kowalski was a senior at Musselman High School in Berkeley County, West Virginia, school administrators suspended her from school for five days for creating and posting to a MySpace.com webpage called "S.A.S.H.," which Kowalski claims stood for "Students Against Sluts Herpes" and which was largely dedicated to ridiculing a fellow student. Kowalski commenced this action, under 42 U.S.C. § 1983, against the Berkeley County School District and five of its officers, contending that in disciplining her, the defendants violated her free speech and due process rights under the First and Fourteenth Amendments. She alleges, among other things, that the School District was not justified in regulating her speech because it did not occur during a "school-related activity," but rather was "private out-of-school speech."

The district court entered summary judgment in favor of the defendants, concluding that they were authorized to punish Kowalski because her webpage was "created for the pur-

pose of inviting others to indulge in disruptive and hateful conduct," which caused an "in-school disruption."

Reviewing the summary judgment record *de novo*, we conclude that in the circumstances of this case, the School District's imposition of sanctions was permissible. Kowalski used the Internet to orchestrate a targeted attack on a classmate, and did so in a manner that was sufficiently connected to the school environment as to implicate the School District's recognized authority to discipline speech which "materially and substantially interfere[es] with the requirements of appropriate discipline in the operation of the school and collid[es] with the rights of others." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 513 (1969) (internal quotation marks omitted). Accordingly, we affirm.

I

On December 1, 2005, Kara Kowalski, who was then a 12th grade student at Musselman High School in the Berkeley County School District, returned home from school and, using her home computer, created a discussion group webpage on MySpace.com with the heading "S.A.S.H." Under the webpage's title, she posted the statement, "No No Herpes, We don't want no herpes." Kowalski claimed in her deposition that "S.A.S.H." was an acronym for "Students Against Sluts Herpes," but a classmate, Ray Parsons, stated that it was an acronym for "Students Against Shay's Herpes," referring to another Musselman High School Student, Shay N., who was the main subject of discussion on the webpage.

After creating the group, Kowalski invited approximately 100 people on her MySpace "friends" list to join the group. MySpace discussion groups allow registered users to post and respond to text, comments, and photographs in an interactive fashion. Approximately two dozen Musselman High School students responded and ultimately joined the group. Kowalski later explained that she had hoped that the group would

"make other students actively aware of STDs," which were a "hot topic" at her school.

Ray Parsons responded to the MySpace invitation at 3:40 p.m. and was the first to join the group, doing so from a school computer during an after hours class at Musselman High School. Parsons uploaded a photograph of himself and a friend holding their noses while displaying a sign that read, "Shay Has Herpes," referring to Shay N. The record of the webpage shows that Kowalski promptly responded, stating, "Ray you are soo funny!=)" It shows that shortly thereafter, she posted another response to the photograph, stating that it was "the best picture [I]'ve seen on myspace so far! ! ! !" Several other students posted similar replies. Parsons also uploaded to the "S.A.S.H." webpage two additional photographs of Shay N., which he edited. In the first, he had drawn red dots on Shay N.'s face to simulate herpes and added a sign near her pelvic region, that read, "Warning: Enter at your own risk." In the second photograph, he captioned Shay N.'s face with a sign that read, "portrait of a whore."

The commentary posted on the "S.A.S.H." webpage mostly focused on Shay N. The first five comments were posted by other Musselman High School students and ridiculed the pictures of Shay N. One student stated that "shay knows about the sign" and then stated, "wait til she sees the page lol." (The abbreviation "lol" means "laugh out loud" or "laughing out loud.") The next comment replied, "Haha.. screw her" and repeatedly stated, "This is great." After expressing her approval of the postings, this student noted the "Shay has herpes sign" and stated, "Kara sent me a few interesting pics. . . Would you be interested in seeing them Ray?" One student posted, "Kara= My Hero," and another said, "your so awesome kara...i never thought u would mastermind a group that hates [someone] tho, lol." A few of the posts assumed that Kowalski had posted the photographs of Shay N., but Parsons later clarified that it was he who had posted the photographs.

A few hours after the photographs and comments had been posted to the MySpace.com page, Shay N.'s father called Parsons on the telephone and expressed his anger over the photographs. Parsons then called Kowalski, who unsuccessfully attempted to delete the "S.A.S.H." group and to remove the photographs. Unable to do so, she renamed the group "Students Against Angry People."

The next morning, Shay N.'s parents, together with Shay, went to Musselman High School and filed a harassment complaint with Vice Principal Becky Harden regarding the discussion group, and they provided Harden with a printout of the "S.A.S.H." webpage. Shay thereafter left the school with her parents, as she did not want to attend classes that day, feeling uncomfortable about sitting in class with students who had posted comments about her on the MySpace webpage.

After receiving Shay N.'s complaint, Principal Ronald Stephens contacted the central school board office to determine whether the issue was one that should be addressed with school discipline. A school board official indicated that discipline was appropriate. Principal Stephens then conducted an investigation into the matter, during which he and Vice Principal Harden interviewed the students who had joined the "S.A.S.H." group to determine who posted the photographs and comments. As part of the investigation, Principal Stephens and Vice Principal Harden questioned Parsons, who admitted that he had posted the photographs. Vice Principal Harden met with Kowalski, who admitted that she had created the "S.A.S.H." group but denied that she posted any of the photographs or disparaging remarks.

School administrators concluded that Kowalski had created a "hate website," in violation of the school policy against "harassment, bullying, and intimidation." For punishment, they suspended Kowalski from school for 10 days and issued her a 90-day "social suspension," which prevented her from attending school events in which she was not a direct partici-

pant. Kowalski was also prevented from crowning the next "Queen of Charm" in that year's Charm Review, having been elected "Queen" herself the previous year. In addition, she was not allowed to participate on the cheerleading squad for the remainder of the year. After Kowalski's father asked school administrators to reduce or revoke the suspension, Assistant Superintendent Rick Deuell reduced Kowalski's out-of-school suspension to 5 days, but retained the 90-day social suspension.

Kowalski claims that, as a result of her punishment, she became socially isolated from her peers and received cold treatment from teachers and administrators. She stated that she became depressed and began taking prescription medication for her depression.

Kowalski acknowledged that at the beginning of each school year, including her senior year, she had received a Student Handbook which included the School District's Harassment, Bullying, and Intimidation Policy, as well as the Student Code of Conduct. The Harassment, Bullying, and Intimidation Policy prohibited "any form of . . . sexual . . . harassment . . . or any bullying or intimidation by any student . . . during any school-related activity or during any education-sponsored event, whether in a building or other property owned, use[d] or operated by the Berkeley Board of Education." The Policy defined "Bullying, Harassment and/or Intimidation" as "any intentional gesture, or any intentional written, verbal or physical act that"

> 1. A reasonable person under the circumstances should know will have the effect of:
>
> > a. Harming a student or staff member;

* * *

    2. Is sufficiently inappropriate, severe, persistent, or pervasive that it creates an intimidating, threatening or abusive educational environment for a student.

The policy also provided that violators would be suspended and that disciplinary actions could be appealed.

The Student Code of Conduct provided, "All students enrolled in Berkeley County public schools shall behave in a safe manner that promotes a school environment that is nurturing, orderly, safe, and conducive to learning and personal-social development." It also committed students to "help create an atmosphere free from bullying, intimidation and harassment" and to "treat others with respect" and "demonstrate compassion and caring." The Code classified "Bullying/Harassment/Intimidation" as a "Level III Violation" with possible consequences including an out-of-school suspension up to 10 days; signing a behavioral contract; being denied participation in class and/or school activities; and a social suspension of up to one semester. Before punishing a student under the Student Code of Conduct, a principal was required to "immediately undertake or authorize an investigation" of the incident and complaint, including "personal interviews with the complain[an]t, the individual(s) against whom the complaint is filed, and others who may have knowledge of the alleged incident(s) or circumstances giving rise to the complaint."

The school administrators' meetings with Kowalski and the other students involved in the "S.A.S.H." webpage were intended to fulfill the procedures described in the Student Handbook.

Kowalski commenced this action in November 2007 against the Berkeley County School District, Superintendent Manny Arvon (in his official capacity), Principal Ronald Stephens (in his official and individual capacities), Vice Principal Becky Harden (in her official and individual capacities),

cheerleading coach Buffy Ashcraft (in her official and individual capacities), and Assistant Superintendent Rick Deuell (in his official capacity), alleging free speech violations under the First Amendment, due process violations under the Fifth Amendment (which Kowalski has acknowledged should have been under the Fourteenth Amendment), cruel and unusual punishment under the Eighth Amendment, and equal protection violations under the Fourteenth Amendment. The complaint also alleged violations of corresponding provisions of the West Virginia Constitution and a state law claim for intentional or negligent infliction of emotional distress. In addition to damages, Kowalski sought a declaratory judgment that the School District's harassment policy was unconstitutionally vague or overbroad and an injunction requiring the school to expunge any record of her discipline.

On the defendants' motion to dismiss the complaint, the district court dismissed Kowalski's free speech claim for lack of standing, concluding that she failed to allege that she had been disciplined under the School District's policy for engaging in speech protected by the First Amendment. In a later ruling denying Kowalski's motion for reconsideration, however, the district court recognized that Kowalski had engaged in speech. Nonetheless, it held that Kowalski lacked standing because her injury would "not be redressed by a favorable decision." Despite this ruling, the district court revisited the merits of Kowalski's free speech claim when it denied her subsequent motion for reconsideration and again when it considered the defendants' motion for summary judgment on Kowalski's remaining claims. In ruling on the summary judgment motion, the court concluded that "the defendants could legitimately take action for [Kowalski's] vulgar and offensive speech and her encouragement of other students to follow suit." The district court also dismissed Kowalski's cruel and unusual punishment claim.

In granting summary judgment to the defendants, in addition to ruling against Kowalski on her free speech claim, the

district court denied Kowalski's due process claim, concluding (1) that Kowalski was on notice that she could be punished for her off-campus behavior and (2) that she was provided with an opportunity to be heard prior to her suspension. The court also denied Kowalski's state law claims and her equal protection claim, with regard to which she had failed to produce any evidence. Finally, the court denied Kowalski's motion for reconsideration.

Kowalski appealed the district court's rulings on her free speech and due process claims under the U.S. Constitution and her state law claim for intentional or negligent infliction of emotional distress. At oral argument, she stipulated that we should treat the district court's judgment as granting summary judgment (rather than a motion to dismiss) on the issues appealed. We review the district court's rulings *de novo*. *See Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997).

## II

Kowalski contends first that the school administrators violated her free speech rights under the First Amendment by punishing her for speech that occurred outside the school. She argues that because this case involved "off-campus, non-school related speech," school administrators had no power to discipline her. As she asserts, "The [Supreme] Court has been consistently careful to limit intrusions on students' rights to conduct taking place on school property, at school functions, or while engaged in school-sponsored or school-sanctioned activity." She maintains that "no Supreme Court case addressing student speech has held that a school may punish students for speech away from school—indeed every Supreme Court case addressing student speech has taken pains to emphasize that, were the speech in question to occur away from school, it would be protected."

The Berkeley County School District and its administrators contend that school officials "may regulate off-campus behav-

ior insofar as the off-campus behavior creates a foreseeable risk of reaching school property and causing a substantial disruption to the work and discipline of the school," citing *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008). Relying on *Doninger*, the defendants note that Kowalski created a webpage that singled out Shay N. for harassment, bullying and intimidation; that it was foreseeable that the off-campus conduct would reach the school; and that it was foreseeable that the off-campus conduct would "create a substantial disruption in the school."

The question thus presented is whether Kowalski's activity fell within the outer boundaries of the high school's legitimate interest in maintaining order in the school and protecting the well-being and educational rights of its students.

The First Amendment prohibits Congress and, through the Fourteenth Amendment, the States from "abridging the freedom of speech." U.S. Const. amend. I; *Gitlow v. New York*, 268 U.S. 652 (1925). It is a "bedrock principle" of the First Amendment that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

While students retain significant First Amendment rights in the school context, their rights are not coextensive with those of adults. *See Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969). Because of the "special characteristics of the school environment," *id.* at 505, school administrators have some latitude in regulating student speech to further educational objectives. Thus in *Tinker*, the Court held that student speech, consisting of wearing armbands in political protest against the Vietnam War, was protected because it did not "'materially and substantially interfer[e] with the requirements of appropriate discipline in the operation of the school' [or] collid[e] with the rights of others," *id.* at 513 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.

1966)), and thus did not "materially disrupt[ ] classwork or involve[ ] substantial disorder or invasion of the rights of others," *id.* Student speech also may be regulated if it is otherwise "vulgar and lewd." *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). Finally, the Supreme Court has held that school administrators are free to regulate and punish student speech that encourages the use of illegal drugs. *Morse v. Frederick*, 551 U.S. 393 (2007).

Although the Supreme Court has not dealt specifically with a factual circumstance where student speech targeted classmates for verbal abuse, in *Tinker* it recognized the need for regulation of speech that interfered with the school's work and discipline, describing that interference as speech that "disrupts classwork," creates "substantial disorder," or "collid[es] with" or "inva[des]" "the rights of others." *Tinker*, 393 U.S. at 513.

In *Tinker*, the Court pointed out at length how wearing black armbands in protest against the Vietnam War was passive and did not create "disorder or disturbance" and therefore did not interfere with the school's work or collide with other students' rights "to be secure and to be let alone." 393 U.S. at 508. Of course, a mere desire to avoid "discomfort and unpleasantness" was an insufficient basis to regulate the speech; there had to be disruption in the sense that the speech "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509 (quoting *Burnside*, 363 F.2d at 749). The Court amplified the nature of the disruption it had in mind when it stated:

> [C]onduct by [a] student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.* at 513.

The *Tinker* Court referred to this amplified statement of its test later in its opinion in shorthand when it concluded that the regulation of armbands "would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt *the work and discipline of the school*." *Id.* (emphasis added). Because, in *Tinker*, the students' wearing of the armbands "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others," there was "no interference with work and no disorder" to justify regulation of the speech. *Id.* at 514.

Thus, the language of *Tinker* supports the conclusion that public schools have a "compelling interest" in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying. *See DeJohn v. Temple Univ.*, 537 F.3d 301, 319-20 (3d Cir. 2008).

According to a federal government initiative, student-on-student bullying is a "major concern" in schools across the country and can cause victims to become depressed and anxious, to be afraid to go to school, and to have thoughts of suicide. *See* StopBullying.gov, available at www.stopbullying.gov (follow "Recognize the Warning Signs" hyperlink). Just as schools have a responsibility to provide a safe environment for students free from messages advocating illegal drug use, *see Morse*, 551 U.S. 393, schools have a duty to protect their students from harassment and bullying in the school environment, *cf. Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place"). Far from being a situation where school authorities "suppress speech on political and social issues based on disagreement with the viewpoint expressed," *Morse*, 551 U.S. at 423 (Alito, J., concurring),

school administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning.

We are confident that Kowalski's speech caused the interference and disruption described in *Tinker* as being immune from First Amendment protection. The "S.A.S.H." webpage functioned as a platform for Kowalski and her friends to direct verbal attacks towards classmate Shay N. The webpage contained comments accusing Shay N. of having herpes and being a "slut," as well as photographs reinforcing those defamatory accusations by depicting a sign across her pelvic area, which stated, "Warning: Enter at your own risk" and labeling her portrait as that of a "whore." One student's posting dismissed any concern for Shay N.'s reaction with a comment that said, "screw her." This is not the conduct and speech that our educational system is required to tolerate, as schools attempt to educate students about "habits and manners of civility" or the "fundamental values necessary to the maintenance of a democratic political system." *Fraser*, 478 U.S. at 681 (internal quotation marks and citations omitted).

While Kowalski does not seriously dispute the harassing character of the speech on the "S.A.S.H." webpage, she argues mainly that her conduct took place at home after school and that the forum she created was therefore subject to the full protection of the First Amendment. This argument, however, raises the metaphysical question of where her speech occurred when she used the Internet as the medium. Kowalski indeed pushed her computer's keys in her home, but she knew that the electronic response would be, as it in fact was, published beyond her home and could reasonably be expected to reach the school or impact the school environment. She also knew that the dialogue would and did take place among Musselman High School students whom she invited to join the "S.A.S.H." group and that the fallout from her conduct and the speech within the group would be felt in the school itself. Indeed, the group's name was "*Students*

Against Sluts Herpes" and a vast majority of its members were Musselman students. As one commentator on the webpage observed, "wait til [Shay N.] sees the page lol." Moreover, as Kowalski could anticipate, Shay N. and her parents took the attack as having been made in the school context, as they went to the high school to lodge their complaint.

There is surely a limit to the scope of a high school's interest in the order, safety, and well-being of its students when the speech at issue originates outside the schoolhouse gate. But we need not fully define that limit here, as we are satisfied that the nexus of Kowalski's speech to Musselman High School's pedagogical interests was sufficiently strong to justify the action taken by school officials in carrying out their role as the trustees of the student body's well-being.

Of course, had Kowalski created the "S.A.S.H." group during school hours, using a school-provided computer and Internet connection, this case would be more clear-cut, as the question of where speech that was transmitted by the Internet "occurred" would not come into play. To be sure, a court could determine that speech originating outside of the schoolhouse gate but directed at persons in school and received by and acted on by them was in fact in-school speech. In that case, because it was determined to be in-school speech, its regulation would be permissible not only under *Tinker* but also, as vulgar and lewd in-school speech, under *Fraser*. *See Fraser*, 478 U.S. at 685. *But cf. Layshock v. Hermitage Sch. Dist.*, No. 07-4465, ___ F.3d ___, 2011 WL 2305970 (3d Cir. 2011) (en banc) (holding that a school could not punish a student for online speech merely because the speech was vulgar and reached the school). We need not resolve, however, whether this was in-school speech and therefore whether *Fraser* could apply because the School District was authorized by *Tinker* to discipline Kowalski, regardless of where her speech originated, because the speech was materially and substantially disruptive in that it "interfer[ed] . . . with the schools'

work [and] colli[ded] with the rights of other students to be secure and to be let alone." *See Tinker*, 393 U.S. at 508, 513.

Given the targeted, defamatory nature of Kowalski's speech, aimed at a fellow classmate, it created "actual or nascent" substantial disorder and disruption in the school. *See Tinker*, 393 U.S. at 508, 513; *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 257 (3d Cir. 2002) (indicating that administrators may regulate student speech any time they have a "particular and concrete basis" for forecasting future substantial disruption). First, the creation of the "S.A.S.H." group forced Shay N. to miss school in order to avoid further abuse. Moreover, had the school not intervened, the potential for continuing and more serious harassment of Shay N. as well as other students was real. Experience suggests that unpunished misbehavior can have a snowballing effect, in some cases resulting in "copycat" efforts by other students or in retaliation for the initial harassment.

Other courts have similarly concluded that school administrators' authority to regulate student speech extends, in the appropriate circumstances, to speech that does not originate at the school itself, so long as the speech eventually makes its way to the school in a meaningful way. For example, in *Boucher v. School Board of School District of Greenfield*, 134 F.3d 821, 829 (7th Cir. 1998), the Seventh Circuit held that a student was not entitled to a preliminary injunction prohibiting his punishment when the student wrote articles for an independent newspaper that was distributed at school. And again in *Doninger*, the Second Circuit concluded, after a student applied for a preliminary injunction in a factual circumstance not unlike the one at hand, that a school could discipline a student for an out-of-school blog post that included vulgar language and misleading information about school administrators, as long as it was reasonably foreseeable that the post would reach the school and create a substantial disruption there. *See Doninger*, 527 F.3d at 48-49. The court explained, "a student may be disciplined for expressive

conduct, even conduct occurring off school grounds, when this conduct 'would foreseeably create a risk of substantial disruption within the school environment,' at least when it was similarly foreseeable that the off-campus expression might also reach campus." *Id.* at 48 (quoting *Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 40 (2d Cir. 2007)). *Cf. J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, No. 08-4138, ___ F.3d ___, 2011 WL 2305973 (3d Cir. 2011) (en banc) (divided court assuming without deciding that the *Tinker* substantial disruption test applies to online speech harassing a school administrator).

Thus, even though Kowalski was not physically at the school when she operated her computer to create the webpage and form the "S.A.S.H." MySpace group and to post comments there, other circuits have applied *Tinker* to such circumstances. To be sure, it was foreseeable in this case that Kowalski's conduct would reach the school via computers, smartphones, and other electronic devices, given that most of the "S.A.S.H." group's members and the target of the group's harassment were Musselman High School students. Indeed, the "S.A.S.H." webpage did make its way into the school and was accessed first by Musselman student Ray Parsons at 3:40 p.m., from a school computer during an after hours class. Furthermore, as we have noted, it created a reasonably foreseeable substantial disruption there.

At bottom, we conclude that the school was authorized to discipline Kowalski because her speech interfered with the work and discipline of the school. *See Tinker*, 393 U.S. at 513; *Doninger*, 527 F.3d at 51-52.

## III

Kowalski next contends that she was denied due process because she "was afforded neither adequate notice nor a meaningful opportunity to be heard before she was deprived of her right to an education and her right to free speech." She

argues that "no language" in the Harassment, Bullying and Intimidation Policy puts students on notice that they "could be subjected to discipline at school for behavior outside of school" and that the school "did not provide the due process required by [its] own policy."

The defendants contend that Kowalski acknowledged receiving copies of the Student Handbook at the beginning of each school year and that the Student Handbook put Kowalski on notice of the Harassment, Bullying and Intimidation Policy, as well as the Student Code of Conduct, both of which prohibit harassment and bullying. They argue, moreover, that "it was reasonably foreseeable [to Kowalski] that [her] chat room could, and in fact did, reach the school premises and cause a substantial disruption" there. The defendants also assert that Kowalski was told about Shay N.'s complaint and allowed to respond before being punished and that "an appeal process was available, and used on her behalf."

While schools are required to provide students with some level of due process, "'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.'" *Fraser*, 478 U.S. at 686 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)). Moreover, schools require this flexibility because they "need . . . to control such a wide range of disruptive behavior." *Sypniewski*, 307 F.3d at 266. In other words, "the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686.

We are satisfied that the Musselman High School Harassment, Bullying and Intimidation Policy, in conjunction with the Student Code of Conduct, adequately put Kowalski on notice of the type of behavior that could be punished by school authorities. The Policy prohibits "any form of racial, sexual, religious/ethnic and disability harassment or violence

or any bullying or intimidation by any student . . . during any school-related activity or during any school-sponsored event," and the separate Student Code of Conduct "sets the requirements for the conduct of students in Berkeley County Schools in order to assure a nurturing and orderly, safe, drug-free, violence and harassment-free learning environment that supports student academic achievement and personal-social development." The Code provides explicitly that "a student will not bully/intimidate or harass another student."

Although the prohibitions against harassment and bullying applied in a "school-related" context, both the Harassment, Bullying and Intimidation Policy and the Student Code of Conduct applied when conduct could adversely affect the school environment. Thus, while the prohibited conduct had to be related to the school, this is not to say that volatile conduct was only punishable if it physically originated in a school building or during the school day. Rather, the prohibitions are designed to regulate student behavior that would *affect* the school's learning environment. Because the Internet-based bullying and harassment in this case could reasonably be expected to interfere with the rights of a student at Musselman High School and thus disrupt the school learning environment, Kowalski was indeed on notice that Musselman High School administrators could regulate and punish the conduct at issue here.

With respect to Kowalski's claim that she did not receive an adequate opportunity to be heard, due process in this context only requires, "in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against [her] and, if [she] denies them, an explanation of the evidence the authorities have and an opportunity to present [her] side of the story." *Goss v. Lopez*, 419 U.S. 565, 585 (1975). Here, these requirements were satisfied. Vice Principal Harden called Kowalski into her office, informed her of the harassment and bullying charge, discussed the "S.A.S.H." group with her, and, after Kowalski

acknowledged her role, imposed a 10-day suspension. Because Kowalski admitted her conduct, the administrators were not required to provide a more extensive opportunity to allow her to justify her conduct.

Kowalski's argument that school administrators did not follow their own policies was not demonstrated in the record and also has no legal merit. Violations of state laws or school procedures "are insufficient by themselves to implicate the interests that trigger a [federal] due process claim." *Wofford v. Evans*, 390 F.3d 318, 325 (4th Cir. 2004); *Weller v. Dept. of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990).

IV

Finally, Kowalski challenges the district court's dismissal of her claim for intentional or negligent infliction of emotional distress. The district court observed that the claim for negligent infliction of emotional distress had no merit because the defendants' conduct did not endanger Kowalski's safety or cause her to fear for her safety, as required by West Virginia law. *Brown v. City of Fairmont*, 655 S.E.2d 563, 569 (W. Va. 2007). The court also concluded that the defendants' actions could not be characterized as "extreme and outrageous," as required under *Brown*, *id.* at 569. Finding no error in the court's analysis of these claims, we affirm the district court's dismissal of them.

V

Kowalski's role in the "S.A.S.H." webpage, which was used to ridicule and demean a fellow student, was particularly mean-spirited and hateful. The webpage called on classmates, in a pack, to target Shay N., knowing that it would be hurtful and damaging to her ability to sit with other students in class at Musselman High School and have a suitable learning experience. While each student in the "S.A.S.H." group might later attempt to minimize his or her role, at bottom, the conduct

was indisputably harassing and bullying, in violation of Musselman High School's regulations prohibiting such conduct.

Kowalski asserts that the protections of free speech and due process somehow insulate her activities from school discipline because her activity was not sufficiently school-related to be subject to school discipline. Yet, every aspect of the webpage's design and implementation was school-related. Kowalski designed the website for "students," perhaps even against Shay N.; she sent it to students inviting them to join; and those who joined were mostly students, with Kowalski encouraging the commentary. The victim understood the attack as school-related, filing her complaint with school authorities. Ray Parsons, who provided the vulgar and lewd—indeed, defamatory—photographs understood that the object of the attack was Shay N., and he participated from a school computer during class, to the cheering of Kowalski and her fellow classmates, whom she invited to the affair.

Rather than respond constructively to the school's efforts to bring order and provide a lesson following the incident, Kowalski has rejected those efforts and sued school authorities for damages and other relief. Regretfully, she yet fails to see that such harassment and bullying is inappropriate and hurtful and that it must be taken seriously by school administrators in order to preserve an appropriate pedagogical environment. Indeed, school administrators *are* becoming increasingly alarmed by the phenomenon, and the events in this case are but one example of such bullying and school administrators' efforts to contain it. Suffice it to hold here that, where such speech has a sufficient nexus with the school, the Constitution is not written to hinder school administrators' good faith efforts to address the problem.

The judgment of the district court is

*AFFIRMED.*