**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| C.R., by and through his parents and next friends, Mark and Kathryn Rainville,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>EUGENE SCHOOL DISTRICT 4J, an Oregon public school district,<br>*Defendant-Appellee.* | No. 13-35856<br><br>D.C. No.<br>CV 12-01042 TC<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Thomas M. Coffin, Magistrate Judge, Presiding

Argued and Submitted October 16, 2015
Portland, Oregon

Submission Vacated October 19, 2015
Resubmitted January 19, 2016

Filed September 1, 2016

Before: A. Wallace Tashima and Carlos T. Bea, Circuit
Judges and Larry A. Burns,[*] District Judge.

Opinion by Judge Tashima

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment
in favor of the Eugene School District 4J in an action brought
by a middle school student suspended for harassment, who
challenged his suspension under the First Amendment,
arguing that because the harassment occurred off-campus, in
a public park, the school lacked the authority to discipline
him.

The panel held that under the unique facts presented by
this case, the School District had the authority to discipline
plaintiff for his off-campus, sexually harassing speech. The
panel noted that the speech at issue occurred exclusively
between students, in close temporal and physical proximity
to the school, on property that was not obviously demarcated
from the campus itself, and that a school may act to ensure
students are able to leave the school safely without
implicating the rights of students to speak freely in the

---

[*] The Honorable Larry A. Burns, United States District Judge for the
Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

broader community.  The panel further held that the School District's decision to suspend plaintiff for two days for sexual harassment was permissible under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).  The panel concluded that plaintiff's suspension was permissible under the First Amendment.

Rejecting plaintiff's due process claims, the panel held that taken in the light most favorable to plaintiff, the uncontroverted facts showed that he was provided the informal procedures that the Constitution requires for a two-day, out-of-school suspension. The panel further held that plaintiff failed to show that he has a substantive due process interest in maintaining a clean, non-stigmatizing school disciplinary record.

---

**COUNSEL**

Marianne Dugan (argued), Eugene, Oregon, for Plaintiff-Appellant.

Blake H. Fry (argued), Mersereau Shannon LLP, Portland, Oregon, for Defendant-Appellee.

Peter D. Hawkes, Lane Powell PC, Portland, Oregon; Kevin Díaz, ACLU Foundation of Oregon, Inc., Portland, Oregon; for Amicus Curiae The American Civil Liberties Union of Oregon.

## OPINION

TASHIMA, Circuit Judge:

C.R., a student in the Defendant Eugene School District 4J (the "School District"), was twelve years old when he was suspended from Monroe Middle School for sexually harassing two younger students. The incident that led to his suspension was the last in an escalating series of encounters with two younger students at the school. It occurred about five minutes after school let out, a few hundred feet from campus. C.R. challenged his suspension in district court under the First Amendment, arguing that because the harassment occurred off-campus, in a public park, the school lacked the authority to discipline him. C.R. also challenged his suspension on due process grounds. The district court rejected C.R.'s claims and granted the School District's motion for summary judgment.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

C.R. was a seventh-grade student at Monroe Middle School when the incident at issue occurred. In October 2011, C.R., along with a few other seventh-grade boys, began following two sixth-grade students home. The two sixth-graders, a girl (A.I.) and a boy (J.R.), were both disabled. All of the children took the same route home: a bike path leading from the school, across a public park, to a neighboring street. The park borders the school's athletic fields, but there is no visible boundary to indicate where school property ends and the park begins. On the far side of the park, across from the

school, is a track belonging to the School District. The school's administrators casually refer to the park, track, and fields collectively as "the back field."

Over the course of several days, the older boys engaged in teasing behavior, which quickly escalated. The boys began by giving the younger students vulgar fake names, like "Ass-Julio," and insisting the sixth-graders repeat them. Soon, the boys' jokes became sexual in nature. On the day in question, the group of older boys circled the younger students. The boys asked the younger students if they watched pornography. The boys asked if A.I. and J.R. were dating, and one boy suggested that J.R. take A.I. to the local B.J.'s Restaurant. This set off a series of comments – puns – on the similarity between the restaurant's name and an abbreviation for the slang term "blowjob," referring to oral sex. One boy told the younger students that there was a "really good" sandwich at B.J.'s that "takes two to eat." He suggested J.R. and A.I. try it together.

Tracy Parks, an instructional aide in the School District, was biking home from school with her daughters when she rode past the group of students. Parks was a friend of C.R.'s mother and had known C.R. since he was in kindergarten. Concerned by the group's posture, Parks approached. She noticed that A.I. looked "a little scared." Parks asked both A.I. and J.R. if they felt comfortable, and although J.R. said "yes," A.I. said "no." Parks told the boys to leave and walked the two younger students home. Along the way, A.I. recounted what had happened, telling Parks that the boys "were talking about [B.J.'s] restaurant, but she thought it was [actually] something else." A.I. repeated to Parks that she was uncomfortable with what had happened.

On Monday, Parks called the school to report what she had seen. Parks spoke with Katherine Kiraly, the school's vice principal. Although she did not know the other boys, Parks told Kiraly that she knew C.R. and could identify him as a participant. Kiraly conferred with then-principal Peter Tromba about Parks' report. She then began an informal investigation.

Kiraly met first with A.I. and J.R. A.I. recounted the series of encounters with the older boys, including their use of vulgar fake names, increasingly sexual comments, and the B.J.'s puns. She told Kiraly that the final encounter made her feel unsafe. Kiraly also interviewed J.R., who did not report feeling uncomfortable during the encounter. Tromba recalled later overhearing the students discussing the incident at lunch with their friends, who were upset to hear how A.I and J.R. had been treated.

Kiraly next interviewed the boys she suspected had been involved in the incident, including C.R. C.R. denied any involvement and insisted that nothing inappropriate had happened. The administrators asked C.R. not to tell the other boys about the interview. C.R. ignored their request and discussed his interview at lunch that same day.

The other boys involved in the incident confirmed A.I.'s story. They admitted making inappropriate comments, including the B.J.'s puns. The boys were clear that they intended their comments about B.J.'s to refer to oral sex. The boys also confirmed that C.R. had participated in the incident, and at least one indicated that C.R. was the ringleader. Called in for a second interview, C.R. admitted that he had made a comment about B.J.'s and that his behavior was inappropriate. Based on these interviews, administrators

determined that the incident fell within the School District's definition of sexual harassment and that C.R. had participated in that harassment.

Tromba and Kiraly disciplined all of the boys involved in the incident, including C.R. In an email, the administrators informed C.R.'s parents of the basis of that decision: Not only had C.R. participated in the incident, he also lied to administrators in his first interview and disobeyed their request to refrain from discussing the interview with his friends. Under the School District's "door-to-door" policy, the administrators determined that they had the power to discipline C.R. for his off-campus speech.[1] Accordingly, the school imposed a two-day, out-of-school suspension.

One year later, C.R.'s parents sued the School District on his behalf, alleging violations of C.R.'s First Amendment and due process rights.[2] The parties filed cross-motions for summary judgment. The district court granted summary judgment to the School District and denied C.R.'s cross-motion for summary judgment. C.R. timely appealed.

---

[1] The parties dispute whether C.R. waived his arguments under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), that school administrators acted pursuant to the School District's policy, custom, or practice when it suspended C.R., precluding him from pursuing his claims against the School District. *See Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Having reviewed the summary judgment papers, we are satisfied that C.R. sufficiently raised the issue. Because the cover of the student handbook defining the door-to-door policy is labeled "Eugene School District 4J," we further conclude that C.R. has adequately shown that administrators disciplined him pursuant to a School District policy.

[2] C.R. also brought several state-law causes of action that are not at issue in this appeal.

## II.

The parties do not dispute the basic facts of the case, as outlined above. Both parties generally agree that a group of boys, including C.R., surrounded A.I. and J.R. in a public park, several hundred feet from the school's property line, and made a series of comments to the younger students about B.J.'s Restaurant. Where, as here, the underlying facts are not in dispute, "the only question . . . is whether the district court correctly applied the law." *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). We review the district court's grant of summary judgement *de novo*. *Szajer v. City of L.A.*, 632 F.3d 607, 610 (9th Cir. 2011). We may affirm the grant of summary judgment on any ground supported by the record. *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009).

C.R. attempts to cast the school's characterization of the incident as sexual harassment as a factual dispute, requiring reversal of summary judgment. It is not. Federal courts owe significant deference to a school's interpretation of its own rules and policies. *See Bd. of Educ. of Rogers, Ark. v. McCluskey*, 458 U.S. 966, 970 (1982); *Wood v. Strickland*, 420 U.S. 308, 326 (1975). We uphold a school's disciplinary determinations so long as the school's interpretation of its rules and policies is reasonable, and there is evidence to support the charge. *See McCluskey*, 458 U.S. at 970; *Wood*, 420 U.S. at 326. The School District's policy defines sexual harassment to include "verbal . . . conduct of a sexual nature" including "sex-oriented verbal kidding, teasing, or jokes." Eugene School District 4J, Student Rights & Responsibilities Handbook (2008). As described above, the school administration's investigation uncovered at least *some* evidence that C.R. participated in sexually suggestive joking

directed at A.I. and J.R.   The School District's characterization of this behavior as sexual harassment in its Student Handbook is reasonable.   Thus, we defer to the School District's determination that C.R. participated in sexual harassment.

## III.

We begin by summarizing the framework for analyzing school regulation of student speech under the First Amendment.   To determine whether a school properly disciplined a student for off-campus speech requires us to answer two questions:   First, we consider the threshold question of whether the school could permissibly regulate the student's off-campus speech *at all*.   Next, we consider the question of whether the school's regulation of the student's speech complied with the First Amendment's requirements. We conclude that C.R.'s suspension was permissible under the First Amendment.

### A.  First Amendment Framework:  School Regulation of Student Speech

"[S]tudents in public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 527 (9th Cir. 1992) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969))*.* At the same time, "[t]he First Amendment rights of public school students 'are not automatically coextensive with the rights of adults in other settings.'" *Id.* (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).  The "basic educational mission" of the school may at times conflict with the speech rights of its students.  *Fraser*,

478 U.S. at 685. Thus, our precedent recognizes that "[s]chools must achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights." *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001) (citing *Karp v. Becken*, 477 F.2d 171, 174 (9th Cir. 1973)).

The Supreme Court has outlined four types of student speech that schools may restrict, each governed by its own lead case: "(1) vulgar, lewd, obscene, and plainly offensive speech is governed by *Fraser*; (2) school-sponsored speech is governed by *Hazelwood* [*School District v. Kuhlmeier*, 484 U.S. 260 (1988)];" (3) "speech promoting illegal drug use" is governed by *Morse v. Frederick*, 551 U.S. 393 (2007); and (4) "speech that falls into [none] of these categories' is governed by *Tinker*." *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1067 (9th Cir. 2013) (internal citations and quotation marks omitted). Each of these leading cases, however, concerns only a school's ability to regulate students' *on-campus* speech. Whether and how these precedents apply to off-campus speech are questions the Supreme Court has yet to answer. *See Morse*, 551 U.S. at 401.

We have twice considered whether schools may regulate students' off-campus speech. Both times, we concluded that the school's regulation was permissible. *Wynar*, 728 F.3d at 1072; *LaVine*, 257 F.3d at 989.

In *LaVine*, a high school student wrote a poem from the perspective of a school shooter. *Id.* at 983–84. Two or three months after he wrote the poem, the student rediscovered it in his living room and brought it to school for his teacher's feedback. *Id.* at 984. The teacher was disturbed by the poem

and shared it with the school's administration, who decided to "emergency expel" the student out of caution. *Id.* at 984–86. The student sued the school, alleging a First Amendment violation. *Id.* at 986. We held that the school did not violate the student's free speech rights when it expelled him based on the poem's violent content. *Id.* at 992. Although we did not explicitly address the poem's off-campus origin, we later interpreted *LaVine* to stand for the proposition that while "the location of the speech can make a difference . . . not . . . all off-campus speech is beyond the reach of school officials." *Wynar*, 728 F.3d at 1068.

In *Wynar*, a student was expelled for a series of messages threatening to commit a school shooting, sent to friends via the social website MySpace. *Id.* at 1065–66. The messages were written and sent from the student's home computer after school hours. *Id.* Nevertheless, we concluded that the school did not violate the student's First Amendment rights when it suspended him. *Id.* at 1070. We held that, "when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech . . . ." *Id.* at 1069.

*Wynar* identified two tests used by our sister circuits to determine when a school may regulate off-campus speech. In *Kowalski v. Berkeley County Schools*, 652 F.3d 565 (4th Cir. 2011), the Fourth Circuit applied a "nexus" test, asking whether a student's off-campus speech was tied closely enough to the school to permit its regulation. *Id.* at 573. In *S.J.W. v. Lee's Summit R–7 School District*, 696 F.3d 771 (8th Cir. 2012), the Eighth Circuit applied a test asking whether it was "reasonably foreseeable" that off-campus speech would reach the school. *Id.* at 777. "[R]eluctant to try and craft a one-size fits all approach," *Wynar* declined to

choose between these tests, holding that both were satisfied in the case of a threatened school shooting. *Wynar*, 728 F.3d at 1069.[3]

More recently, the Fifth Circuit en banc also held that schools may sometimes discipline students for off-campus speech. *See Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379 (5th Cir. 2015) (en banc). In *Bell*, a student was disciplined for uploading a rap video containing vulgar and arguably threatening lyrics to the websites Facebook and YouTube. *Id.* at 383. The student recorded and uploaded the video at home. *Id*. Even so, the court concluded that the school permissibly regulated the student's speech. *Id.* at 400. In reaching its decision, the court declined "to adopt or reject approaches advocated by other circuits," instead holding that a school may regulate students' off-campus speech "when a student intentionally directs at the school community speech reasonably understood by school officials to threaten, harass, and intimidate a teacher . . . ." *Id.* at 396. Whatever the legal test ultimately applied, courts consistently engage in a circumstance-specific inquiry to determine whether a school permissibly can discipline a student for off-campus speech.

Once the court has determined that a student's off-campus speech was susceptible to regulation by the school, we apply *Tinker* to evaluate the constitutionality of the school's imposition of discipline. *See Wynar*, 728 F.3d at 1070–71;

---

[3] *Wynar* noted that, in *Wisniewski v. Board of Education of the Weedsport Central School District*, 494 F.3d 34 (2nd Cir. 2007), the Second Circuit also considered the question of discipline for off-campus student speech. That court declined to decide whether to apply the Eight Circuit's "reasonably foreseeable" test or its own variation of that test. *See Wynar*, 728 F.3d at 1068 (discussing *Wisniewski*, 494 F.3d at 39).

*LaVine*, 257 F.3d at 992. "Under *Tinker*, schools may restrict speech that 'might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities' or that collides 'with the rights of other students to be secure and to be let alone.'" *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 508, 514). Thus, for its actions to survive First Amendment scrutiny, the School District must show both that it had the authority to reach C.R.'s off-campus speech and that the imposition of discipline complied with *Tinker*.

## B. The School District Had the Authority to Discipline C.R. for His Off-Campus, Sexually Harassing Speech

We have not yet considered whether a school may discipline a student for off-campus sexual harassment. Nor are there any directly analogous decisions from any other circuit. Rather, the vast majority of the law in this area concerns school officials' authority to discipline students for internet speech. In this case, nothing was put into writing, and the students' speech was never shared online; the offending comments were made in person, just as school was letting out, a few hundred feet from the school's property line.

We follow *Wynar* in applying both the nexus and reasonable foreseeability tests to C.R.'s speech. We conclude that under either test, the School District had the authority to discipline C.R. for his off-campus speech.

1.   *Nexus*

Although the harassment at issue in this case took place off school property, it was closely tied to the school. First, all of the individuals involved were students, a fact that typically counsels in favor of finding that a student's speech was susceptible to school discipline. *See Wynar*, 728 F.3d at 1069 (finding school showed nexus in part because all individuals involved were students); *Kowalski*, 652 F.3d at 573 (same). Next, the incident took place on a path that begins at the schoolhouse door. The path then runs from the school's fields across a public park that shares a boundary with school property, before eventually meeting a neighboring street. A.I. and J.R. had not yet reached the street when the older boys caught up to them. As a result, the students were only a few hundred feet from the school door when the harassment began. Moreover, while the park is technically city property, it is referred to by school administrators as part of "the back field." There is no visual marker (*i.e.*, a fence or other boundary) to indicate where school property ends and the city park begins; it is therefore unclear whether the students even recognized that they had left school property.

Furthermore, all of the students had been let out of school just minutes before the incident. The school's schedule thus brought the students together on the bike path. Had all of the students not been released from school at the same time and walked home along the same path, the older students would not have had the same opportunity to sexually harass the younger students. The record does not reflect whether there were alternative routes home available to the younger students, but it is clear that it was school itself that brought the children together on the path. Moreover, it is a reasonable exercise of the School District's *in loco parentis* authority to

be concerned with its students' well being as they begin their homeward journey at the end of the school day. *See Fraser*, 478 U.S. at 684; *Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654–56 (1995) (collecting cases).

### 2. Reasonable Foreseeability

Because the harassment happened in such close proximity to the school, administrators could reasonably expect the harassment's effects to spill over into the school environment. Simply seeing their harassers in the hallway could well be disruptive for affected students. Similarly, a student who is routinely subject to harassment while walking home from school may be distracted during school hours by the prospect of the impending harassment. A student's ability to focus during the day could be impaired by intrusive worries about whether she or he would once again face uncomfortable and sexually intimidating comments immediately after school lets out.

Administrators could also reasonably expect students to discuss the harassment in school. Indeed, A.I. was upset enough about the incident to discuss it with her friends in the lunch room. And administrators likely could not disregard the possibility that the older students would continue to harass their targets if they encountered one another in the hallways or the school yard. Because the harassment in this case was so closely connected to campus – on the students' walk home, a few hundred feet from the school, immediately after school let out – administrators could reasonably expect that the effects of the speech would extend to the students' in-school experience. *Cf. Kowalski*, 652 F.3d at 573 ("[Plaintiff] also knew . . . that the fallout from her conduct and the speech

within the [MySpace page] would be felt in the school itself.").

Under either the nexus test or the reasonable foreseeability test, the School District could take reasonable disciplinary action against C.R.'s off-campus speech.

C.R. contends that finding for the School District on this point would dangerously expand its reach, permitting schools to regulate student speech in public places, like a shopping mall, bookstore, or movie theater, where children might stop on the way home from school. But we do not hold that either test extends the school's authority so far – that is a question for another day.**[4]**

Our decision is necessarily restricted to the unique facts presented by this case: The speech at issue occurred exclusively between students, in close temporal and physical proximity to the school, on property that is not obviously demarcated from the campus itself. A school may act to ensure students are able to leave the school safely without implicating the rights of students to speak freely in the broader community. In short, the School District's actions were reasonable under *Wynar*. For all of the foregoing

---

**[4]** It suffices for now to observe that, typically, malls, bookstores, and movie theaters are located more than a few hundred feet from the schoolhouse door. And unlike the field next to the school, such venues are unlikely to be confused with school property. Presumably, students also would have more options to avoid any such place of suspected harassment or could ask an older sibling or parent to accompany them there. Unlike in this case, the school's schedule would not directly lead to the students' encounter. Both *Wynar* tests rely on the speech's close connection with the school to permit administrative discipline. That connection is missing in the scenarios C.R. conjures.

reasons, we conclude that the School District had the authority to discipline C.R. for his off-campus, sexually harassing speech.

### C.  C.R.'s Suspension Was Permissible Under *Tinker*

*Tinker* permits schools to restrict student speech in two broad sets of circumstances:  if the speech "might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities," or, alternatively, if the speech "collides 'with the rights of other students to be secure and to be let alone.'"  *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 508, 514).  The School District's decision to discipline C.R. falls squarely within *Tinker*'s second set of circumstances.

"The precise scope of *Tinker*'s interference with the rights of others language is unclear."  *Wynar*, 728 F.3d at 1072 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3rd Cir. 2001)).  We have held, however, that speech that "is merely offensive to some listener" is not sufficient, and does not fall within *Tinker*'s scope.  *Id.*  Sexually harassing speech is more than that.  In *Wynar*, we held that MySpace messages threatening a school shooting "represent the quintessential harm to the rights of other students to be secure."  *Id.*  Almost by definition, the speaker's explicit, physical threat prevented the targeted students from feeling safe in school.

Sexual harassment also implicates the rights of students to be secure.  Such harassment is harmful because it positions the target as a sexual object rather than a person, threatening the individual's sense of physical, as well as emotional and psychological, security.  Often, the threat of an unwanted

physical intrusion is implicit even within the context of purely verbal sexual harassment. Schools therefore must have the authority to discipline students for engaging in sexually inappropriate and harassing speech. *Cf. Fraser*, 478 U.S. at 685 ("We hold that [the] School District acted entirely within its permissible authority in imposing sanctions upon [a student] in response to his offensively lewd and indecent speech.").

The facts of this case illustrate the point. Both of the targeted students were unable to return home after school without being subjected to questions about sex acts and whether they were dating – inappropriate and unsettling questions for students just out of elementary school. Unsurprisingly, A.I. reported feeling scared and uncomfortable after the encounter. The school could therefore reasonably expect that those feelings would cause A.I. to feel less secure in school, affecting her ability to perform as a student and engage appropriately with her peers. Moreover, the harassment had already begun to escalate from the repetition of curse words to sexual comments directed at the victims. The school could reasonably expect the harassment to escalate further if allowed to continue unchecked. Without intervening administrative action, the younger students would be deprived of their right to be secure at school.

The targeted students' age is also relevant to the analysis. The Supreme Court has recognized that overtly sexual speech "could well be seriously damaging to its less mature audience" when that audience was younger than 14 years old "and on the threshold of awareness of human sexuality." *Id.* at 683; *see also Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649 (1999) (noting that, when it

comes to student sexual harassment, grade schools may exercise a greater degree of control over student speech than colleges). Because C.R.'s speech interfered with the younger students' rights to be secure and let alone, we conclude that his suspension was permissible under *Tinker*.[5]

In sum, we conclude: First, the district court correctly held that the School District could discipline C.R. for his off-campus speech. Second, the School District's decision to suspend C.R. for two days for sexual harassment was permissible under *Tinker*. Sexually harassing speech, by definition, interferes with the victims' ability to feel safe and secure at school. The district court did not err in granting summary judgment to the School District on C.R.'s First Amendment claims.

## IV.

C.R.'s due process claims also fail.

### A. Procedural Due Process

The Constitution requires only informal procedures when schools suspend students for ten days or fewer. "[T]he

---

[5] The School District's disciplinary action may also have been permissible under the *Tinker* test's "substantial disruption" language. *See Kowalski*, 652 F.3d at 574 (holding that "schools have a compelling interest in regulating speech that interferes with or disrupts the work and discipline of the school, including . . . student harassment and bullying," and that interest justifies punishing off-campus sexual harassment under *Tinker* in order to provide "a safe school environment conducive to learning" (internal quotation marks omitted)). Because we conclude that the School District's disciplinary action falls within the *Tinker* test's "rights of others" language, however, we do not reach this issue.

student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). The school need not outline specific charges and their potential consequences or notify parents of the charges prior to the student's suspension. *Wynar*, 728 F.3d at 1072–73. "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss*, 419 U.S. at 582. We require "only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." *Id.*

It is undisputed that, in his interviews, C.R. received informal notice of the charges against him and an opportunity to tell his side of the story. C.R. testified that Kiraly and Troma expressed concern about the way A.I. and J.R. had been treated and suspicion that the younger students had been harassed, before asking C.R. for "the whole story." Taken in the light most favorable to C.R., the uncontroverted facts show that he was provided those informal procedures that the Constitution requires for a two-day, out-of-school suspension.

C.R. contends that the school did not provide him with sufficient notice of the specific nature of the allegations, or of how his conduct violated the school rules. It is not constitutionally required that the school inform a student of the specific rules or policies he allegedly violated. *Wynar*, 728 F.3d at 1073. Accordingly, the school also need not take the extra step of informing the student exactly *how* his conduct violated the specific rules at issue – no bill of particulars is required. C.R. further contends that the school

did not provide him an adequate opportunity to gather relevant evidence to rebut the school's charges. This, too, is not constitutionally required. *Goss*, 419 U.S. at 582.

Finally, C.R. contends that the school violated his procedural due process rights by not following its *own* policies regarding suspension. However, school administrators' "purported failure to comply with their own administrative procedure does not, itself, constitute a violation of constitutional due process." *Wynar*, 728 F.3d at 1073. Thus, even assuming that C.R. is correct that the School District did not follow its own procedures for issuing a suspension in his case, he still cannot state a claim for deprivation of procedural due process on this basis. The district court thus correctly concluded that the School District afforded C.R. all the process that he was due.

## B.  Substantive Due Process

C.R. contends that the school violated his substantive due process rights when it recorded the reason for his suspension as "harassment - sexual."[6] According to C.R., the stigma from this label was so strong that he was deprived of his right to a good reputation.

C.R. fails to show that he has a substantive due process interest in maintaining a clean, non-stigmatizing school disciplinary record. "Substantive due process refers to certain

---

[6] After being suspended for sexual harassment, C.R. was later suspended for stealing office supplies. The discipline record (somewhat dramatically) refers to the incident as "theft - major." C.R. included this designation in his substantive due process claim and the following discussion applies equally to both record designations.

actions that the government may not engage in, no matter how many procedural safeguards it employs." *Wedges/Ledges of Cal. v. City of Phoenix, Ariz.*, 24 F.3d 56, 66 (9th Cir. 1994) (quoting *Blaylock v. Schwinden*, 862 F.2d 1352, 1355 (9th Cir. 1988)). Generally speaking, substantive due process protects an individual's fundamental rights to liberty and bodily autonomy. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 564 (2003); *Roe v. Wade*, 410 U.S. 113, 168 (1973) (Stewart, J., concurring); *Loving v. Virginia*, 388 U.S. 1, 12 (1967). Here, no fundamental rights are at stake. There is no reason why a school should not be permitted to record the reason for a student's suspension, however unsavory, so long as it applied the appropriate procedural safeguards while pursuing its investigation. C.R. fails to raise any viable substantive due process claim.[7]

## V.

In our digital age, a school's power to discipline students for off-campus speech has become an increasingly salient question for the courts. This case, however, presents us with

---

[7] C.R. also contends that the district court erred in dismissing his motion to compel further discovery as moot, once it had ruled on the cross-motions for summary judgment. We will not disturb such a denial of discovery "except upon the clearest showing that the denial . . . results in actual and substantial prejudice . . . ." *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1085, 1093 (9th Cir. 2003) (internal quotation marks omitted). C.R. did not file his motion to compel until two months after the expiration of the discovery cutoff date and more than a month after he filed his own motion for summary judgment. The motion was, therefore, untimely, and the district court had no obligation to consider it. *See Laborde v. Regents of the Univ. of Cal.*, 686 F.2d 715, 719 (9th Cir. 1982). Moreover, C.R. made no showing that he suffered any prejudice as a result of the ruling. We thus conclude that the district court did not abuse its discretion in dismissing C.R.'s motion as moot.

an analog problem: Whether the School District overstepped its authority when it disciplined C.R. for engaging in sexual harassment a few hundred feet from the school's physical boundaries, a few minutes after class let out. Under this set of facts, we conclude that C.R.'s speech was tied closely enough to the school to subject him to the school's disciplinary authority. As imposed by the school, that discipline complied with the requirements of *Tinker*. Finally, we conclude that the School District afforded C.R. all of the process the Constitution requires.

The district court's order granting the School District's motion for summary judgment and denying C.R.'s cross-motion for summary judgment, and its order dismissing the action are

**AFFIRMED.**