[Cite as *N.Z. v. Madison Bd. of Edn.*, 2017-Ohio-6992.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| N.Z. | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellant | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. 16CA71 |
| | : | |
| MADISON BOARD OF EDUCATION | : | |
| | : | |
| | : | |
| | : | |
| Defendant-Appellee | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Richland County Court
                             of Common Pleas, Case No. 2015-CV-
                             1519 D



JUDGMENT:                    AFFIRMED




DATE OF JUDGMENT ENTRY:      July 26, 2017




APPEARANCES:

For Plaintiff-Appellant:              For Defendant-Appellee:

ALAN M. MEDVICK                       ANDREW BURTON
23 S, Main St.                        9 North Mulberry Street
Third Floor, The Nantucket Building   Mansfield, OH 44902
Akron, OH 44308

*Delaney, P.J.*

{¶1} Plaintiff-Appellant N.Z. appeals the September 15, 2016 judgment entry of the Richland County Court of Common Pleas. N.Z. is the mother of the student involved in this case. We shall refer to N.Z. and her child as "Mother" and "Student" in this opinion.

**FACTS AND PROCEDURAL HISTORY**

{¶2} The Madison Local School District is located in Mansfield, Ohio. During the 2015-2016 school year, Student was a pupil at Madison Comprehensive High School.

{¶3} On Tuesday, October 6, 2015, the Madison Comprehensive High School received a bomb threat, requiring an evacuation of the students from the building.

{¶4} On Friday, October 9, 2015, around the lunch hour, a teacher was walking down the stairs of the high school and she noticed a three-ring binder laying at the bottom of the stairwell. The teacher looked at the binder and observed that "Klebold Surprise" was written on the cover. The names "Dylan Klebold" and "Eric Harris" were also written on the cover of the binder. Dylan Klebold and Eric Harris were the students responsible for the 1999 Columbine High School shootings. The teacher did not touch the binder, but immediately went to the library to contact the Dean of Students about the presence of the binder in the hallway.

{¶5} The Dean of Students was supervising the lunchroom when he received a radio message that he needed to report to the library. He came to the library and found the teacher and librarian in a state of panic. The two teachers took the Dean of Students to location of the binder. The Dean of Students picked up the binder and took it to his office. He then radioed the Principal, who was also on lunchroom duty, to come to the administrative offices.

{¶6} The Dean of Students opened the binder. He found academic papers inside the binder with the name of a student, G.E., written on the papers. The Dean of Students called G.E. to the office. Upon questioning by the Dean of Students, G.E. said he knew about the binder but he did not write "Klebold Surprise" on the cover. He said two other students, Student and B.C., were present when "Klebold Surprise" was written. Student and B.C. were called to the office.

{¶7} The school administrators interviewed the students to determine why the students wrote the names of the Columbine shooters on the binder and then left the binder in the school hallway. Student, G.E., and B.C. were interviewed individually. None of the students were forthcoming with information and the Dean of Students felt they were being evasive. G.E. said B.C. wrote the names of the Columbine shooters on the binder. B.C. said G.E. wrote the names. Student thought B.C. wrote the names.

{¶8} The school administrators confiscated the cell phones of B.C. and G.E. Student did not have a cell phone. When the Dean of Students picked up B.C.'s cell phone, the phone received a text message from C.C., another high school student. B.C. let the Dean of Students read the text message and it stated in part, "We're fucked, they know about the Columbine shit, I'm going to get expelled." The Dean of Students felt the students were involved in more serious activity than just writing names on a three-ring binder. C.C. was called to the office.

{¶9} During C.C.'s interview, he told the Dean of Students that a group of students were part of a message group on Kik. Kik is a free mobile messaging app for smartphones. While he was speaking, C.C. showed the school administrators his cell phone and the Principal observed the wallpaper on C.C.'s cell phone was a photo of

Adam Lanza, the man who committed the Sandy Hook elementary school shooting. At this time, the Principal asked the Dean of Students to call law enforcement to continue the investigation.

{¶10} The school administrators continued to speak with the students regarding the message group on Kik. One of the students gave the school administrators access to the message group on the Kik app. A password was required to access the message group. The message group was named "Klebold Kuck Krew." The message group contained posts including hate speech specifically towards African-Americans, sexually aggressive language, discussions of school shootings, photos of students with access to firearms, photos of stabbing weapons, videos of students with firearms and comments about killing African-Americans. Student admitted to being an active participant on the Kik message group since September 2015. Law enforcement told the school administrators they felt the participants on the message group could be forming a hate group.

{¶11} After viewing the screen names in the message group, the school administrators called two more students down to the office. The Dean of Students, Principal, two other school administrators, and four law enforcement officers were involved interviewing students, gathering information, and calling the student's parents. The investigation started in the late morning on October 9, 2015 and it was not until after 3:00 pm before the last student left.

{¶12} The school administration determined to emergency remove from school the students involved in the message group, including Student. The basis for the emergency removal was to allow the school to conduct a further investigation before the school considered suspension. Pursuant to the 2015-2016 Madison Comprehensive High

School Student Handbook, "emergency removal" is "the exclusion of a student who poses a continuing danger to District property or persons in the District or whose behavior presents an on-going threat of disrupting the educational process provided by the District." On October 9, 2015, the Principal spoke to each student with his or her parent representative and explained the process for emergency removal. The Principal told the student and parent representative the school intended to contact them within three days to tell them when their hearing would be scheduled and to hold the hearing within three days.

{¶13} No school was held on Monday, October 12, 2015 because it was Columbus Day. The school administration intended to contact the students on Wednesday, October 14, 2015, to notify them the emergency removal hearing would be held on Friday, October 16, 2015. On Wednesday, October 14, 2015, however, the Madison Local School District received a district-wide bomb threat and all school buildings were evacuated. The school administration contacted Student on Thursday, October 15, 2015, to notify him of the emergency removal hearing on Friday, October 16, 2015.

{¶14} Student and Mother attended the emergency removal hearing on Friday, October 16, 2015. The Dean of Students presented an explanation of the events of October 9, 2015 and why the school administration pursued an emergency removal. The Principal asked Student if the Dean of Students had presented any inaccurate information, but Student said everything was accurate. Student admitted to participating in the message group. He understood the activity on the message group was inappropriate but he chose not to remove himself from the group. The Principal asked

Student if he had anything he wanted to share, expecting Student to offer an apology, but Student stated he did not have anything to say.

{¶15} At the conclusion of the emergency removal hearing, the Dean of Students and Principal met separately and determined to suspend Student. The Dean of Students filled out a "Notice of Intended Suspension From School" form and it was given to Student and his mother at the emergency removal hearing. The reasons given for Student's suspension were for "creating a disturbance of curricular activities" and "attempted to mislead school personnel" in violation of Sections 5 and 18 of the Code of Student Conduct. On the form, the Principal checked the box that imposed a ten-day suspension with recommendation of expulsion. Student signed the form indicating he received a copy of the Notice of Intended Suspension on October 16, 2016. At the bottom of the form, it provided for the "Notice of Suspension." The Principal concluded upon his review of the facts and circumstances that Student was to be suspended from school for ten days beginning on Monday, October 19, 2016 and ending Friday, October 30, 2015.

{¶16} On October 16, 2015, the school administrators sent a letter to the Superintendent recommending that Student be expelled.

{¶17} On Tuesday, October 20, 2015, the Superintendent mailed by ordinary and certified mail a "Notice of Intent to Consider Expulsion from School" to Student and his mother at the mailing address listed in the school records. The notice informed Student and Mother that an expulsion hearing was scheduled on Friday, October 30, 2015.

{¶18} On Thursday, October 22, 2015, there was a bomb threat for the Madison Local School District and a nearby local school district. On Monday, October 26, 2015, there was a shooter threat at Madison Local School District.

{¶19} On Friday, October 30, 2015, the expulsion hearing went forward before the Superintendent. Student, his grandmother, and Student's two attorneys were present at the hearing. On October 30, 2015, the Superintendent sent a "Notice of Expulsion From School" to Student and Mother at the mailing address listed in the school records. The notice informed Student and his mother that the Superintendent expelled Student from school beginning November 2, 2015 through January 8, 2016. It was also agreed Student would successfully complete a counseling program and enroll in an online school or alternative program at the end of his expulsion period. The notice informed Student and Mother of their right to appeal the expulsion decision to the Madison Local School District Board of Education. Student appealed.

{¶20} Student, his family, and his counsel appeared before the Madison Local School District Board of Education on Wednesday, November 18, 2015. The Dean of Students and the Principal testified at the hearing. After the hearing, the Board of Education affirmed the Superintendent's order of expulsion.

{¶21} Mother, on Student's behalf, filed an administrative appeal of the Board of Education's decision with the Richland County Court of Common Pleas pursuant to Ohio Revised Code Chapter 2506. Mother argued in her appeal that: (1) the emergency removal, suspension, and expulsion process violated Student's due process rights because the school administrators did not comply with R.C. 3313.66 and (2) Student's First Amendment right as to free speech were violated by the Board of Education's decision to affirm his expulsion.

{¶22} The trial court issued its decision on September 15, 2016. The trial court reviewed the whole record to determine if Board of Education's decision to expel Student

from school was supported by a preponderance of reliable, substantial, and probative evidence. As part of the record, the trial court considered the numerous bomb and shooting threats that Madison Local School District received during October 2015. The trial court first found while the school administration did not fully meet the timing requirements of R.C. 3313.66, Student's due process rights were not violated during the emergency removal, suspension, and expulsion proceedings. Student fully participated in all stages of the proceedings and was represented by counsel at the expulsion hearing and expulsion appeal. The trial court next found Student's First Amendment rights were not violated by Student's expulsion. The trial court found Student's private conversation outside of school in the "Klebold Kuck Krew" message group was brought into school when the three-ring binder labeled "Klebold Surprise" was found in the school hallway and the members of the message group warned other members on October 9, 2015 to not tell the school administration about the message group. The trial court found it relevant the message group glorified school violence and was discovered by school administrators during a time the Madison Local School District was receiving multiple bomb and shooting threats.

{¶23} It is from this decision Mother now appeals.

## ASSIGNMENTS OF ERROR

{¶24} Mother raises one Assignment of Error:

{¶25} "THE LOWER COURT ABUSED ITS DISCRETION BY AFFIRMING THE DECISION OF THE MADISON BOARD OF EDUCATION TO EXPEL STUDENT FROM MADISON HIGH SCHOOL."

**ANALYSIS**

**Standard of Review**

{¶26} Mother argues the trial court abused its discretion when it affirmed the decision of the Madison Local School District Board of Education to expel Student from Madison Comprehensive High School. The matter comes before us upon an administrative appeal pursuant to Ohio Revised Code Chapter 2506.

{¶27} As an appellate court, our standard of review to be applied in an R.C. 2506.04 appeal is "limited in scope." *Kisil v. Sandusky*, 12 Ohio St.3d 30, 465 N.E.2d 848 (1984). "This statute grants a more limited power to the court of appeals to review the judgment of the common pleas court only on 'questions of law,' which does not include the same extensive power to weigh the preponderance of the substantial, reliable, and probative evidence, as is granted to the common pleas court." *Id.* Ultimately, the standard of review for appellate courts in a R.C. 2506 appeal is "whether the common pleas court abused its discretion in finding that the administrative order was or was not supported by reliable, probative, and substantial evidence." *See Weber v. Troy Twp. Board of Zoning Appeals*, 5th Dist. Delaware No. 07 CAH 04 0017, 2008-Ohio-1163. "The standard of review for courts of appeals in administrative appeals is designed to strongly favor affirmance" and "permits reversal only when the common pleas court errs in its application or interpretation of the law or its decision is unsupported by a preponderance of the evidence as a matter of law." *Cleveland Clinic Foundation v. Cleveland Board of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161.

**Students Are Entitled to Due Process**

{¶28} Mother contends Student's due process rights were violated by the Madison Local School District during the emergency removal, suspension, and expulsion process. Mother argues specifically the school disregarded notification and timing requirements found in the Madison Comprehensive High School Student Handbook and R.C. 3313.66.

{¶29} The United States Supreme Court has stated that students facing temporary suspension from public school have property and liberty interests that qualify for protection under the Due Process Clause under the Fourteenth Amendment. *Beaver v. Licking Valley Local School Dist. Bd. of Edn.*, 2015-Ohio-4557, 46 N.E.3d 1080, ¶ 29 (5th Dist.) citing *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), paragraph one of syllabus. "While children do not 'shed their constitutional rights * * * at the schoolhouse gate,' * * * the nature of those rights is what is appropriate for children in school." *State v. Polk*, 2017-Ohio-2735, -- N.E.3d --, ¶ 22 citing *Veronia School Dist., 47J v. Acton*, 515 U.S. 646, 655–656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) quoting *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In the *Goss* case, the Court held that prior to interference with the student's legitimate entitlement to a public education as a property interest protected by the Due Process Clause, due process requires the school to give the student some kind of notice and afforded some kind of hearing. *Goss, supra,* at paragraphs one and two of the syllabus.

**Due Process and the Emergency Removal**

{¶30} Mother contends Student's emergency removal from school on October 9, 2015 did not comply with the Madison Comprehensive High School Student Handbook or

R.C. 3313.66(C) and therefore violated Student's due process rights. On October 9, 2015, after interviewing the students and discussing the matter, the school administrators decided to remove Student from school. The Principal spoke with Student and Mother to explain Student was being emergency removed and that the school intended to contact them within three days to tell them when their hearing would be held. School was not in session on Monday, October 12, 2015 and Wednesday, October 14, 2015. The school notified Student and Mother of the hearing on October 15, 2016 to be held on October 16, 2015.

{¶31} The Student Handbook states:

If a student's presence poses a continuous danger to persons or property, or an on-going threat of disrupting the academic process, then the Superintendent, principal or assistant principal may remove the student from the premises. * * * If a teacher makes an emergency removal, reasons will be submitted to the principal in writing as soon after the removal as practicable. * * * If the emergency removal exceeds twenty-four (24) hours, then a due process hearing will be held within seventy-two (72) hours after the removal is ordered. Written notice of the hearing and the reason for removal and any intended disciplinary action will be given to the student as soon as practical prior to the hearing. The student will have the opportunity to appear at an informal hearing before the principal, assistant principal, Superintendent or designee, and has the right to challenge the reasons for the intended suspension or otherwise explain his/her actions. The person or persons who ordered or requested the removal will be present at the

hearing, and within twenty-four (24) hours of the decision to suspend, written notification will be given to the parent(s), guardian(s) or custodian(s) of the student, and Treasurer of the Board. This notice will include the reasons for the suspension and the right of the student or parent to appeal to the Superintendent or his/her designee.

{¶32} The Student Handbook follows the language of R.C. 3313.66(C), with one difference:

* * * If a pupil is removed under this division from a curricular activity or from the school premises, written notice of the hearing and of the reason for the removal shall be given to the pupil as soon as practicable prior to the hearing, which shall be held within *three school days* from the time the initial removal is ordered. * * * (Emphasis added.)

{¶33} Mother contends the school did not follow the guidelines of the Student Handbook or R.C. 3313.66(C) because the school did not give written notice of the reasons for removal, written notice of the hearing, and the hearing was not held within three school days or 72 hours from the time the initial removal was ordered. The trial court found on October 9, 2015, the Principal verbally informed Mother and Student of the reasons for Student's emergency removal. Because the emergency removal was going to exceed 24 hours, the Principal told Mother and Student that they would be contacted within three days for a hearing. The school did not contact Mother and Student until October 15, 2016 for the hearing on October 16, 2015. There was no school on October 12, 2015 due to a school holiday and October 15, 2015 due to a bomb threat requiring an evacuation of all buildings in the school district. The hearing went forward on Friday,

October 16, 2015. The trial court found that Mother and Student received sufficient notice of the reasons for the emergency removal, notice of the hearing, and a hearing to satisfactorily protect Student's due process rights.

{¶34} In determining the timing and content of the notice and the nature of the hearing, the United Supreme Court in *Goss* recognized that "schools are vast and complex. Some modicum of discipline and order is essential if the educational function is to be performed. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." *Goss, supra,* at 580. "[T]here are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable * * *." *Goss, supra,* at 582.

{¶35} The school administration determined Student's involvement in the creation of the "Klebold Surprise" binder and participation in the "Klebold Kuck Krew" message group posed a possible threat to the students of the Madison Comprehensive High School, especially in light of the bomb threat the school received three days before the discovery of the binder. The school administrators immediately removed Student from school and provided Student and Mother with the necessary notice and rudimentary hearing as soon as practicable. Student was removed from school on the afternoon of Friday, October 9, 2015. School was not in session on Monday, October 12, 2015 and Wednesday, October 14, 2015. The school notified Student of the hearing on Thursday, October 15, 2015 to be held on Friday, October 16, 2015. The school notified Student of

the hearing within two school days of the emergency removal and held the hearing within three school days of the emergency removal.

{¶36} The trial court found the preponderance of the substantial, reliable, and probative evidence supported the finding that Student's due process rights were protected during the emergency removal process. We find no abuse of discretion.

## Due Process and the Suspension

{¶37} Mother next contends the school administrators violated Student's due process rights during the suspension process. On Thursday, October 15, 2015, the school administration notified Mother and Student by telephone that the emergency removal/suspension hearing was going to be held on Friday, October 16, 2016. On Friday, October 16, 2016, Mother and Student appeared at the hearing before the Principal. The Dean of Students was also present. The Principal provided Mother and Student a form entitled, "Notice of Intended Suspension from School." The form notified Student he may be suspended from school for the reasons of "creating a disturbance in curricular activities" and "attempted to mislead school personnel" in violation of sections 5 and 18 of the Code of Student Conduct. The form also notified Student the Principal was considering a ten-day suspension with recommendation of expulsion. Student signed the form stating he received a copy of the "Notice of Intended Suspension." During the hearing, the Dean of Students presented an explanation for the charges against Student and Student was given an opportunity to present his side of the story. After the hearing, the Principal determined to suspend Student for ten days. The suspension started on Monday, October 19, 2015 and ended on Friday, October 30, 2015. Mother and Student were provided a copy of the "Notice of Suspension" at the hearing.

{¶38} The Madison Comprehensive High School Student Handbook states:

* * * No period of suspension will be for more than ten (10) school days. The guidelines listed below will be followed for all suspensions * * *.

1. The student will be informed in writing of the potential suspension and the reasons for the proposed action.

2. The student will be provided the opportunity for an informal hearing to challenge the reason for the intended suspension and explain his/her actions.

3. An attempt will be made to notify parents or guardians by telephone if a suspension is issued.

4. Within twenty-four (24) hours, a letter will be sent to the parent or guardian stating the specific reasons for the suspension and including notice of their right to appeal such action.

{¶39} R.C. 3313.66(A) states:

Except in the case of a pupil given an in-school suspension, no pupil shall be suspended unless prior to the suspension the superintendent or principal does both of the following:

(1) Gives the pupil written notice of the intention to suspend the pupil and the reasons for the intended suspension * * *

(2) Provides the pupil an opportunity to appear at an informal hearing before the principal, assistant principal, superintendent, or superintendent's designee and challenge the reason for the intended suspension or otherwise to explain the pupil's actions.

{¶40} Constitutional due process requires that when a school suspends a student for ten days or less, the school must provide the student with: "(1) adequate notice of the charge against the student, (2) an explanation of the evidence supporting the charge and (3) an opportunity for the student to respond." *Williams v. Cambridge Bd. of Edn.* (C.A.6, 2004), 370 F.3d 630, 639, citing *Goss v. Lopez* (1975), 419 U.S. 565, 583, 95 S.Ct. 729, 42 L.Ed.2d 725.

{¶41} There need not be a delay between the time the school gives the student "notice" and the time of the hearing. *Buckosh v. Westlake City Schools*, 8th Dist. Cuyahoga No. 91714, 2009-Ohio-1093, ¶ 16 citing *Goss, supra,* at 582. In most cases, the school administrator may "informally discuss the alleged misconduct with the student minutes after it has occurred * * *. [I]n being given an opportunity to explain his version of the facts at this discussion, the student [must] first be told what he is accused of doing and what the basis of the accusation is." *Id.* Both the notice and the hearing should occur before the school removes the student from the school to serve the suspension. *Id.; Rossman v. Conran* (1988), 61 Ohio App.3d 246, 250, 572 N.E.2d 728.

{¶42} The trial court found Student's due process rights were not violated by the suspension process. The record in this case supports the finding that Student and Mother were provided notice of the charge against Student and an opportunity for Student to respond.

{¶43} Mother also argues the school violated Student's due process rights by suspending him in excess of the ten days allowed by statute. Mother claims four school days passed before Student's hearing on Friday, October 16, 2015, when he was officially

suspended for ten days. Mother contends the additional four days between his removal and suspension was a *de facto* expulsion that was not proceeded by notice and hearing.

{¶44} Student was emergency removed in the afternoon of Friday, October 9, 2015. School was not in session on Monday, October 12, 2015 or Wednesday, October 14, 2015. Student was not permitted to attend school on Tuesday, October 13, 2015 and Thursday, October 15, 2015, and Friday, October 16, 2015. On Thursday, October 15, 2015, the school notified Student of the hearing and held the hearing on Friday, October 16, 2015. Student was not present for three school days. These three school days were part of the emergency removal process, not the suspension process. The record in this case shows the school notified Student of the hearing within two school days of the emergency removal and held the hearing within three school days of the emergency removal.

{¶45} As the trial court found, we likewise find on appeal Mother has not shown any prejudice suffered by Student during the suspension process due to notice or hearing defects.

### Due Process and the Expulsion

{¶46} Mother finally contends Student's due process rights were violated during the expulsion process. The Madison Comprehensive High School Handbook explains the expulsion process:

> * * * The Superintendent will give the student and parent(s), guardian(s) or
> custodian(s) written notice of the intended expulsion, including reasons for
> the intended expulsion. The student and parent or representative has the
> opportunity to appear on request before the Superintendent or designee to

challenge the action or to otherwise explain the student's actions. This notice will state the time and place to appear which must not be less than three (3) days nor later than five (5) days after the notice is given.

Within twenty-four (24) hours of the expulsion, the Superintendent will notify the parent(s), guardian(s), or custodian(s) of the student and Treasurer of the Board.

The notice will include the reasons for the expulsion, and the right of the student, parent(s), guardian(s) or custodian(s) to appeal to the Board of Education or its designee; the right to be represented at the appeal and the right to request the hearing be held in executive session.

{¶47} The expulsion process outlined in the Student Handbook follows the language of R.C. 3313.66(B)(6)(b).

{¶48} The Superintendent issued the "Notice of Intent to Consider Expulsion from School" to Mother and Student on Tuesday, October 20, 2015. The written notice notified Student and Mother the expulsion hearing was scheduled for Friday, October 30, 2015. Mother contends Student was deprived of his due process protections because the expulsion hearing was not held within three to five school days after the notice was given.

{¶49} The trial court found that pursuant to the statutory guidelines and the Student Handbook, the hearing should have been held on Monday, October 26, 2015 or Tuesday, October 27, 2015. "[T]he spirit of R.C. 3313.66 clearly intends that a pupil should not risk cold evidence nor lose valuable classroom time to administrative delay on the part of disciplining school officials." *Beaver v. Licking Valley Local School Dist. Bd. of Edn.*, 2015-Ohio-4557, 46 N.E.3d 1080, ¶ 41 (5th Dist.) quoting *Stuble v. Cuyahoga*

*Valley Joint Vocational School Dist. Bd. of Education,* 8th Dist. Cuyahoga No. 44412, 1982 WL 5953 (Oct. 7, 1982). The trial court determined Student suffered no prejudice from a three-day delay of the hearing. Student did not unnecessarily miss school because he was serving his suspension from October 19, 2015 to October 30, 2015. At this stage of the proceedings, Student was represented by counsel. Student did not object to the hearing date. Student makes no assertion he was prejudiced by the hearing date or his rights were affected by the hearing date.

{¶50} We find the trial court made no abuse of discretion in determining the school's delay in holding the expulsion hearing did not materially affect Student's due process rights.

{¶51} In summary, Student's due process rights were protected during the emergency removal, suspension, and expulsion process.

**Students Have First Amendment Rights, With Exceptions**

{¶52} Mother also argues the school violated Student's First Amendment rights when it expelled him based on Student's involvement in the creation of the "Klebold Surprise" binder and participation in the "Klebold Kuck Krew" message group.

{¶53} The United States Supreme Court held in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed. 731 (1969) that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." Teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* However, "school officials retain some authority consistent with fundamental constitutional safeguards to prescribe and control conduct in the schools." *Nixon v. Hardin*

*Cty. Bd. of Educ.*, 988 F.Supp.2d 826, 833, (W.D.Tenn.2013) citing *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 331 (6th Cir.2010). "The constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings, and the Constitution does not compel school officials to surrender control of the American public school system to public school students." *Id.*

{¶54} In *Tinker*, a group of high school students decided to wear black armbands to protest the Vietnam War. School officials learned of the plan and adopted a policy prohibiting students from wearing armbands. *Morse v. Frederick*, 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) citing *Tinker* at 504. The students wore the armbands to school and the school suspended the students. The students sued arguing their First Amendment rights were violated and the Supreme Court agreed. *Id.*

{¶55} *Tinker* provided the standard for evaluating whether the First Amendment protects a student's speech. *Bell v. Itawamba Cty. School Bd.*, 799 F.3d 379, 390 (5th Cir.2015). The Court held that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." *Tinker* at 513.

{¶56} The United States Supreme Court has outlined four types of student speech that schools may restrict, each governed by its own lead case: "(1) vulgar, lewd, obscene, and plainly offensive speech is governed by [*Bethel Sch. Dist. No. 403 v.] Fraser*, [478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)]; (2) school-sponsored speech is governed by *Hazelwood [School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)];" (3) "speech promoting illegal drug use" is governed by *Morse v. Frederick*, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007); and (4) "speech that

falls into [none] of these categories' is governed by *Tinker.*" *C.R. v. Eugene School Dist. 4J*, 835 F.3d 1142, 1148-1149 (9th Cir.2016) quoting *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1067 (9th Cir. 2013) (internal citations and quotation marks omitted). These cases, however, speak only to the school's ability to regulate a student's on-campus speech.

### School Regulation of Off-Campus Speech

{¶57} The students in this matter created the message group outside of school and without school resources. The issue raised by Mother is whether the school has authority to regulate off-campus speech. Neither the United States Supreme Court, the U.S. Sixth Circuit Court of Appeals, nor the Ohio Supreme Court have ruled on the issue whether schools may regulate off-campus online speech by students in light of *Tinker* and its progeny. *Nixon v. Hardin Cty. Bd. of Educ.*, 988 F.Supp.2d 826, 836 (W.D.Tenn.2013) citing *Yoder v. Univ. of Louisville*, 526 Fed.Appx. 537, 545 (6th Cir.2013) (noting that neither the Supreme Court nor the Sixth Circuit have ruled on the subject), cert. denied, ⸺ U.S. ⸺, 134 S.Ct. 790, 187 L.Ed.2d 594 (2013).

{¶58} In making its decision to determine whether the school violated Student's First Amendment rights in the present case, the trial court relied on a decision from the U.S. Fifth Circuit Court of Appeals, *Bell v. Itawamba Cty. School Bd.*, 799 F.3d 379 (5th Cir.2015). In *Bell*, a high school student (off-campus and without using any school resources) posted a rap recording containing violent and threatening language against two high school teachers/coaches on Facebook and YouTube. Both the Facebook and YouTube accounts were publicly accessible. *Id.* at 382. The school interpreted the language as threatening, harassing, and intimidating the teachers. The school took

disciplinary action against Bell. Bell brought action against the school, claiming the school's actions violated his First Amendment rights. *Id.*

{¶59} After examining *Tinker* and its progeny, the Fifth Circuit found *Tinker* governs the analysis "when a student intentionally directs at the school community speech reasonably understood by school officials to threaten, harass, and intimidate a teacher, even when such speech originated, and was disseminated, off-campus without the use of school resources." *Id.* at 396.

{¶60} The U.S. Ninth Circuit Court of Appeals has twice considered whether schools may regulate students' off-campus speech. *C.R. v. Eugene School Dist. 4J*, *supra*, at 1149. *In LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir.2001), the court found a poem written by a high school student from the perspective of a school shooter was subject to the school's regulation and the school did not violate the student's free speech rights when it expelled him based on the poem's violent content. *Id.* at 992. In *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062 (9th Cir. 2013), the student was expelled for a series of messages sent through MySpace threatening to commit a school shooting. The court held the school did not violate the student's First Amendment rights when it suspended him because "when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech * * *." *Id.* at 1069.

{¶61} The U.S. Fourth Circuit Court of Appeals applied a "nexus" test, asking whether a student's off-campus speech was tied closely enough to the school to permit its regulation. *C.R. v. Eugene School Dist. 4J, supra*, at 1149 citing *Kowalski v. Berkeley Cty. Schools*, 652 F.3d 565, 573 (4th Cir.2011). In *S.J.W. v. Lee's Summit R–7 School District*, 696 F.3d 771 (8th Cir. 2012), the Eighth Circuit applied a test asking whether it

was "reasonably foreseeable" that off-campus speech would reach the school. *C.R. v. Eugene School Dist. 4J, supra*, at 1149 citing *S.J.W., supra*, at 777.

{¶62} The Ninth Circuit found that "[w]hatever the legal test ultimately applied, courts consistently engage in a circumstance-specific inquiry to determine whether a school permissibly can discipline a student for off-campus speech." *C.R. v. Eugene School Dist. 4J, supra*, at 1150.

{¶63} If it is determined that a student's off-campus speech was susceptible to regulation by the school, the court is to apply *Tinker* to evaluate the constitutionality of the school's imposition of discipline. *Id.*; *Bell, supra*, at 396-397. *Tinker* permits schools to restrict speech that "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" or collides with the rights of others. *Tinker, supra*, at 513-514.

**The School Had the Authority to Discipline Student for His Off-Campus Speech**

{¶64} Mother contends the school did not have authority to discipline Student for his participation in the message group and creation of the binder. The message group was password-protected and did not contain any direct references or threatening language about a specific person or school community. Mother does not dispute the binder and message group contained references to the Columbine shootings, sexual language, and racial epithets. The content of the message group, however, was private among the members and the members never intended to convey the content to the school community.

{¶65} The trial court found Student and the other participating students may not have intended the binder and the contents of the message group to reach the school

community, but Student's private conversations reached the school community on October 9, 2015. The trial court stated:

> Student participants in the "KKK" chatroom extended their so-called "private conversation," one that glorified school violence, into the school when they: 1) wrote "The Klebold Surprise" and "Dylan Harris" on the cover of a notebook at school and left it in the stairwell to be discovered; and 2) communicated with each other on their phones within the school and during school hours, warning the recipient(s) not to tell school officials about the chatroom.

(Judgment Entry, Sept. 15, 2016). The trial court found the student's text warnings were an attempt to obstruct discovery of the message group by school officials. Further relevant to the trial court's determination that the binder and the message group impacted the school community was that the school received a bomb threat three days before the binder was discovered.

{¶66} Under a circumstance-specific inquiry, nexus test, or reasonable foreseeability test, we find the trial court did not abuse its discretion in finding the school had the authority to regulate Student's off-campus speech. Student was a participant in the creation of a binder that the students labeled "Klebold Surprise," a direct reference to the Columbine shootings. A teacher found the binder in the stairwell of the school building while school was in session. The reference to the Columbine shootings, three days after a bomb threat, caused the teacher to feel panic and instigated a school investigation to determine whether there was another threat of violence in the school. During the investigation, the Dean of Students discovered Student's participation in the "Klebold

Kuck Krew" message group through text messages sent by a student during the school day. The text message warned the members that the school knew about the students' interest in the Columbine shootings. While the evidence does not show the content of the message group was specifically directed at a teacher, student, or school community, the Dean of Students testified as to the contents of the message group:

> Officer Kotterman later said it was a year's worth of material of hate speech, particularly against black – the black race. He – it was sexual in nature, aggressive sexual in nature, talking about school shootings, kind of glorifying school shootings. A lot of hate speech, like I said. It showed students with access to firearms. It showed pictures of stabbing weapons. In particular there were two videos that were – that I saw that were disturbing. There was one of a student with a loaded rifle putting it up by his mouth and then unloading the rifle to where the ammunition was shooting out. There was a second video of a student pulling a – he was in downtown Mansfield and he was in a car by himself and he pulled a Glock handgun out of his pocket, and as the kids were going down and using the kick (sic) site, you know, comments like time to kill niggers or niggers are going to die.

(Tr. 26-27).

{¶67} We agree with the trial court's determination the school had the authority to regulate Student's off-campus speech. The binder was found at school and the discovery of the binder led to the discovery of the message group. The binder and the message group, of which Student was a participant, referenced the Columbine shootings and other

violent acts. The message group demonstrated the students had access to weapons. It was not an abuse of discretion to find the off-campus speech in this case had a connection with the school to permit administrative discipline.

**Student's Expulsion Was Permissible Under *Tinker***

{¶68} *Tinker* permits schools to restrict speech that "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" or collides with the rights of other students to be secure and let alone. *Tinker,* 393 U.S. at 513-514; C.R. v. *Eugene School Dist. 4J,* 835 F.3d at 1152; *Wynar*, 728 F.3d at 1070.

{¶69} The trial court found the discovery of the binder with the label "Klebold Surprise" and the time and resources expended in its investigation was sufficient disruption to curricular activities to justify the suspension and expulsion of Student. A teacher found the binder in the school stairwell, causing her panic. The teacher, with another teacher, showed the Dean of Students the binder, which resulted in an investigation. The investigation into the binder led to the discovery of the message group. The investigation into the message group further disrupted curricular activities. The Dean of Students, Principal, two other school administrators, and four law enforcement officers were involved interviewing multiple students, gathering information, and calling the student's parents. The investigation started in the late morning on October 9, 2015 and it was not until after 3:00 pm before the last student left.

{¶70} The trial court further found the contents of the binder and the message group reasonably led the school administration to forecast substantial disruption or material interference with school activities. The Principal testified he considered the

speech to be "a growing threat, a concern to our students. * * * [Student] admitted to being an active participant in a group that we felt threatened our students." (Tr. 63). The school discovered the binder and the content of the message group at a time when the school was already investigating a threat of school violence. After October 9, 2015, the school received three more threats of violence requiring evacuation.

{¶71} The Ohio Supreme Court recently addressed the balance between the student's expectation of privacy and the need to protect public-school students from physical harm in *State v. Polk*, -- Ohio St.3d --, 2017-Ohio-2735, -- N.E.3d --. The Ohio Supreme Court held a student's Fourth Amendment right was not violated by the school's protocol requiring searches of unattended book bags – to determine ownership and whether the contents are dangerous – because it furthers the compelling governmental interest in protecting students from physical harm. *Id.* at ¶ 2. The Court stated:

> Schools have an obligation to keep their students safe. *Earls,* 536 U.S. at 830, 122 S.Ct. 2559, 153 L.Ed.2d 735. "Columbine, Virginia Tech University, and now Sandy Hook underscore a fundamental policy change that has taken place in our schools. We now pursue a new fundamental value in our schools: security." Demitchell, *Locked Down & Armed: Security Responses to Violence in Our Schools,* 13 Conn.Pub.Int.L.J. 275, 281 (2014). The United States Department of Homeland Security's "See Something Say Something" website warns that persons should be suspicious of "abandoned" items like luggage. *See* http://www.nationalterroralert.com/suspicious-activity/ (accessed Apr. 17, 2017). Because of "the perceived crisis concerning violence and drug use

in the schools, * * * school officials may be remiss if they *do not* find and seize objects which might pose a threat to the well being of other students or school officials." (Emphasis sic.) Ferraraccio, *Metal Detectors in the Public Schools: Fourth Amendment Concerns,* 28 J.L. & Educ. 209, 214 (1999).

*Id.* at ¶ 25.

{¶72} In this case, we find the school could discipline Student for his off-campus speech. The school's emergency removal, suspension, and expulsion was permissible under *Tinker.* We find the school did not violate Student's First Amendment right to free speech.

## CONCLUSION

{¶73} The sole Assignment of Error of Mother is overruled.

{¶74} The judgment of the Richland County Court of Common Pleas is affirmed.

By: Delaney, P.J.,

Baldwin, J. and

Wise, Earle, J., concur.